Robert BRONSTEIN, t/a R & B Management Associates and Welsh-Grant Developers, a Limited Partnership

v.

The PHILADELPHIA FAIR HOUSING COMMISSION, Shelly Friedman, Office of Loan Management, United States Department of Housing and Urban Development, Lawrence B. Simons, Assistant Secretary, United States Department of Housing and Urban Development, Patricia Harris, Secretary of the Department of Housing and Urban Development and United States Department of Housing and Urban Development.

Civ. A. No. 78–1636.

United States District Court,
E. D. Pennsylvania.

May 1, 1980.

---

**1358**

Henry A. Stein, Philadelphia, Pa., for plaintiffs.

Henry W. deLuca, Asst. City Solicitor, Philadelphia, Pa., Elizabeth Langer, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D. C., for defendants.

## OPINION

LUONGO, District Judge.

This action challenges the authority of the Philadelphia Fair Housing Commission (FHC) to enforce the city's housing and fire code in a federally insured housing project by suspending rent increases that had been approved by the United States Department of Housing and Urban Development (HUD). Plaintiffs Robert Bronstein and Welsh-Grant Developers (Welsh-Grant) are, respectively, manager and owner-mortgagor of Woodhaven Gardens, the project affected by the FHC order. The complaint prays for injunctive and declaratory relief and includes a somewhat nebulous claim for

damages.[1] Defendants are the FHC; HUD; former HUD secretary Patricia Harris; Lawrence B. Simons, assistant HUD secretary responsible for supervision of federally insured mortgages; and Shelly Friedman, assistant to defendant Simons in HUD's office of loan management.[2] Plaintiffs allege that the action arises under the Constitution (fifth and fourteenth amendments/due process); section 221 of the National Housing Act, 12 U.S.C. § 1715*l* (1976 & Supp. II 1978); and HUD regulations, 24 C.F.R. Part 403 (1978), promulgated pursuant to section 7(d) of the Housing and Urban Development Act, 42 U.S.C. § 3535(d) (1976). Jurisdiction is predicated on 28 U.S.C. § 1331(a) (1976).

■ The case is presently before me on motions by plaintiffs and the federal defendants. Arguing that HUD regulations preempt the FHC's authority to suspend federally approved rent increases as a means of code enforcement, plaintiffs move for summary judgment against the FHC. The FHC has interposed no objection to the entry of summary judgment against it. The federal defendants, however, vigorously contest plaintiffs' motion. HUD and the defendant federal officials have consistently adhered to their position that the regulations do not prohibit the action taken by the FHC. Indeed, they peg their motion for summary judgment on counts I, II and IV on that argument. In addition, the federal defendants, construing plaintiffs' prayer for "costs incurred in attempting to require the defendants to follow HUD's regulations . . ." as a claim for compensatory damages, move in the alternative to dismiss that aspect of counts I and II on the ground of sovereign immunity. Upon review of the memoranda submitted by the parties and after oral argument, I conclude that plaintiffs are entitled to summary judgment on the preemption issue but that the damages claim against the federal defendants must be dismissed.

*The Background of the Controversy*

Woodhaven Gardens, the target of the FHC order, is a 518 unit garden apartment and townhouse complex with a federally subsidized mortgage granted pursuant to section 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l*(d)(3) (Supp. II 1978). The first mortgages and first mortgage notes on the property are insured by the Federal Housing Administration (FHA) and are now held by the Federal National Mortgage Insurance Corporation. Because Woodhaven Gardens is a federally subsidized project, many aspects of its operations are regulated by HUD. One area of HUD control is the regulation of rents, and HUD approval is required before the owner-mortgagor may implement a rent increase.

The seeds of this controversy took root in early 1977 when plaintiff Welsh-Grant applied for a rent increase at Woodhaven Gardens. As required by HUD regulations, 24 C.F.R. §§ 401.2 to .4 (1978), Welsh-Grant provided the tenants of Woodhaven Gardens with notice of its application to HUD, then submitted to HUD financial and other documentation in support of its application together with tenant comments regarding the requested increase. HUD subsequently authorized an 8.4% increase in rent effective July 1, 1977, and an additional 6.4% increase effective October 1, 1977.

Sometime during this period, tenants of Woodhaven Gardens opposed to the increase organized the Woodhaven Tenants Council, secured legal representation, and protested the rent increases to the FHC, alleging

---

1. "That the defendants and each of them be directed to reimburse plaintiff for reasonable counsel fees and costs incurred in attempting to require the defendants to follow HUD's regulations and for the costs of this action, a sum in excess of $10,000. . . ." Amended Complaint (Doc. No. 18) ¶ 52(b).

2. Counts I and II, which run against the federal defendants, and count III, which runs against

the FHC, seek injunctive relief, damages, attorneys' fees, and costs. Count IV seeks a declaration that federal regulations preempt the jurisdiction of the FHC. Count V, which charged defendant Friedman in his individual capacity and sought damages therefor, has been dismissed by consent of the parties. *See* Doc. No. 51.

violations of the city's fire and housing codes. On July 5, 1977, plaintiffs' counsel communicated to the assistant city solicitor plaintiffs' position that HUD regulations preempted the authority of the FHC to affect the HUD-approved rent increases. Amended Complaint (Doc. No. 18), Exhibit B. Nevertheless, on July 21, 1977, the FHC advised plaintiff Bronstein that it had notified the Woodhaven tenants not to pay the "requested" rent increase because of outstanding code violations, and that it had set September 7 as a hearing date on the issue. *Id.*, Exhibit A. The FHC then rescinded its July 21 order on August 2, 1977, and advised the Woodhaven tenants to pay 'the rent increase as of July 1. *Id.* ¶ 22. A hearing was held as scheduled on September 7, 1977, following which the FHC directed the Woodhaven tenants to escrow the disputed increases pending a final hearing. *Id.* ¶ 27.

Prior to and following the escrow directive, there was also a volley of communication flowing between plaintiffs, the FHC, and HUD officials. On August 11, 1977, defendant Friedman advised the acting director of HUD's Philadelphia area office that HUD regulations at 24 C.F.R. Part 403 did not preempt the jurisdiction of the FHC, and the acting director relayed Friedman's position to the Philadelphia city solicitor by letter dated August 15, 1977. *Id.* ¶ 25 & Exhibit C. These HUD officials had concluded that the power of the FHC related to code enforcement as opposed to rent control and that, consequently, the FHC order had only an indirect impact on rents. *Id.*, Exhibit C. HUD's position on the preemption issue articulated in the August 15 letter prompted a letter from plaintiffs' counsel on August 26, 1977, requesting HUD's acting regional administrator to review the regulations and reconsider the agency's stand on the jurisdiction of the

FHC. *Id.*, Exhibit D. Having received no response from the regional administrator, plaintiffs' counsel communicated directly with defendant Simons. In letters dated November 16 and December 6, 1977, plaintiffs again requested HUD to reassess its stance on the preemption issue. *Id.*, Exhibit E. On December 28, 1977, defendant Simons replied that HUD had not yet formulated a final position with respect to the proceedings before the FHC. *Id.*, Exhibit E.

The FHC held a second hearing on January 25, 1978. After argument on the preemption issue, the FHC entered an order continuing the escrow arrangement and prohibiting the enactment of future rent increases until HUD reached a decision (presumably on the preemption issue); the order also conditioned the implementation of the approved increase upon correction of the code violations cited. *Id.*, Exhibit H.[3] On February 2, 1978, the FHC rescinded the existing order and issued in its place the following order:

> There will be no Rent Increase until all the violations are complied with [sic] and a Clearance Certificate obtained. The next rental due date after this, the Rent Increase will take effect.
>
> All rent monies held in Escrow by the Urban League will remain there until this issue is resolved by H.U.D.
>
> *Id.*, Exhibit J.

By letter dated April 24, 1978, the director of housing management in HUD's Philadelphia area office notified plaintiff Bronstein that the release of the escrow funds held by the Urban League was a matter between plaintiffs and the FHC. *Id.*, Exhibit K. A letter issued on May 1, 1978, to plaintiffs' counsel by the chairman of the FHC in effect reaffirmed the February 2 order and advised that the release and disposition of the money held in escrow was

---

3. The text of the order reads as follows:

"1. That the tenants of Woodhaven Gardens Apartments must continue to pay rent increases into the Urban League Escrow Account until such time that the Department of Housing and Urban Development reaches a decision in this matter.

2. That there will be no rent increases until all electrical code violations cited by the Department of Licenses & Inspections have been corrected and a Clearance Certificate granted.

3. That no future rent increases can be enacted until the Department of Housing and Urban Development makes a decision."

contingent upon a final determination by HUD. *Id.*, Exhibit L. This action was filed on May 8, 1978. To date, the money has remained in escrow.

### The Preemption Issue

The controversy at bar revolves around a single legal issue, namely, whether HUD regulations preempt the authority of the FHC to suspend a HUD-approved rent increase in the name of code enforcement. Section 403.1(a) of the regulations, which defines the scope and effect of HUD's authority, states that "[t]he regulation of rents for projects coming within the scope of 'Subpart C—Subsidized Insured Projects' is preempted in its entirety by the promulgation of these regulations." 24 C.F.R. § 403.1(a) (1978). Section 403.9, which applies to subsidized insured projects, reiterates that intent. After noting the desirability of minimizing defaults by the mortgagor, preserving the viability of the projects as a source of low-income housing, and protecting the government's substantial economic interest, HUD states its intent to preempt "the entire field of rent regulation by local rent control boards . . . or other authority, acting pursuant to state or local law as it affects projects covered by this subpart." *Id.* § 403.9.

Plaintiffs argue that the regulations unequivocally and totally prohibit any interference by the FHC with the federally approved rent structure for Woodhaven Gardens. The federal defendants, on the other hand, contend that the regulations preempt only the control of rents by local rent control boards. They argue that the FHC is not a rent control board but simply a municipal body charged with the enforcement of the city's fire and housing codes; hence, its authority is not preempted by the regulations upon which plaintiffs rely. Plaintiffs do not dispute the federal defendants' assertion that the FHC is not a rent control board. They do contest the federal defendants' contention that the FHC is not an "other authority" subject to the strictures of the regulations.

The federal defendants advance a relatively restrictive definition of "other authority." Emphasizing the language of section 403.1(a) of the regulations that speaks of the "local rent control board or other authority *regulating rents* pursuant to state or local law," the federal defendants would limit the preemptive intent of the regulations to authorities that regulate rents in the same manner as local rent control boards. The federal defendants distinguish the power of the FHC, differentiating the power to freeze rents until code violations are corrected from the power to "regulate" rents. To the federal defendants, the concept of rent regulation connotes only the function traditionally reposed in a rent control board, namely, the determination of the maximum allowable rent.

As the federal defendants quite properly point out, the FHC performs none of the functions of a traditional rent control board. The FHC apparently does not inquire whether the percentage increase sought is financially justifiable or even reasonable; its only concern is the preservation of the status quo pending compliance with the housing and fire codes. Nevertheless, I am not persuaded that the limited role of the FHC determines the nonapplicability of the regulations. Indeed, I conclude that the FHC is an "other authority" whose jurisdiction is preempted by the regulations to the extent that it exercises control over the federally approved rent structure.

Mindful of the deference accorded to an agency's interpretation of its regulations, *see, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), I do not lightly reject the reading urged by the HUD officials. The agency's interpretation, however, cannot stand if it is plainly erroneous or inconsistent with the regulatory scheme, *see e. g., Standard Oil Co. of Ohio v. FEA,* 612 F.2d 1291, 1297 (Em.App. 1979), and I so find in this instance. Whether the agency's conclusion that the regulations do not preempt the power of the FHC to suspend the federally approved rent increases hinges upon the nature of the authority or the thrust of the order, the position taken by the federal defendants

cannot be sustained when tested against logic and the regulatory scheme.

There can be no question that if preemption were to turn upon the nature of the authority, the results would be anomalous. For example, under this analysis, the power of a housing authority, with both traditional rent control and code enforcement functions, to freeze rents because of existing code violations would be preempted simply because the authority is, in fact, a "rent control board", while the power of an authority like the FHC would not. This result would obtain even though both authorities would be performing identical functions that have an identical impact on the rent structure.

Assume, on the other hand, that the purpose of the local board's order were the pivotal inquiry. Presumably, under the federal defendants' view of the regulations, a board with both rent control and code enforcement authority could block a federally approved rent increase where the housing is in violation of local codes, at least as long as the board's reinstatement of the rent increase is contingent on compliance with the local code. Yet, this result appears to fly in the face of the regulations, which are quite explicit:

> It is the purpose of the Department that these regulations shall bar *all* actions of a board that would in any way frustrate the purpose or effect of these regulations or *that would in any way delay, prevent or interfere with the implementation of any increase in rental charges approved by HUD.*

> 24 C.F.R. § 403.1(c) (1978) (emphasis added).

The import of the regulatory language could not be clearer. The regulations preclude a local authority, which is vested with control over the rent structure of local units, from exercising that control in a way that interferes with the rent structure of a federally subsidized housing project.

The foregoing examples may seem somewhat strained, but they nevertheless serve to illustrate that the proper focus of the preemption inquiry is not on the function of the local authority or the purpose behind a particular mandate, but rather on whether the local body is vested with the power to control the rent structure of local housing units. That the FHC has this power, albeit under limited circumstances, cannot be denied.

The federal defendants make a facile attempt to distinguish the power to enforce local codes from the power to regulate rents. This distinction is not, however, as readily discernible as defendants suggest. Take, for example, the hypothetical body referred to above. Assume that instead of freezing rents at current levels pending correction of outstanding code violations, the local body suspends only a portion of the approved increase pending compliance so that the permissible rent prior to compliance reflects the diminution in the rental value of the premises attributable to the violations. Can it truly be said that this exercise of power is any less a regulation of rents because it was taken to encourage compliance with the local codes? And is there an appreciable difference, for purposes of the regulations and the preemption inquiry, between permitting a proportion of the projected increase and freezing rents entirely? The answer to both questions must be in the negative, for each exemplifies the power to control the rent structure. What the authority has done, in each instance, is to set a rent ceiling on nonconforming housing. To be sure, the partial suspension of rents entailed an assessment of the units' rental value while the freezing of rents did not. This, however, is a distinction without a difference when analyzing whether the activity in each instance is a form of rent regulation that is preempted by HUD. To conclude otherwise would truly bring about an incongruous result in that the regulations would prohibit the former mechanism (partial suspension based on an assessment of the fair rental value of a nonconforming unit) as an impermissible form of rent regulation, but permit the latter, which in this instance is much more intrusive and potentially more threatening to the viability of the project.

In their efforts to justify their view of the regulations, the federal defendants also argue that the FHC's freezing of the rent levels has only an indirect impact on the rent structure. Amended Complaint (Doc. No. 18), Exhibit C. This assertion is considerably naive, especially when judged against the FHC's apparent understanding of its authority. It can be fairly inferred, from the letter of May 1, 1978, by the chairman of the FHC to plaintiffs' counsel, that the money paid into escrow would not be recouped by plaintiffs if the power of the FHC to suspend the disputed rent increases were ultimately upheld. *See id.,* Exhibit L ("tenants who vacated and/or paid the rent increase even though the violations existed, are entitled to a reimbursement or credit at such time as H.U.D. makes their [sic] determination"). Whether this letter in fact represents the current position of the FHC vis-a-vis the escrowed rent increases is not abundantly clear, nor is it substantially important. It is sufficiently to the point that at the time the HUD officials judged the effect of the FHC order to be "indirect," the prospect existed that the escrowed money would be returned to the tenants and that plaintiffs would never see those rent increases ordered withheld by the FHC. In any event, by making compliance with the city codes a prerequisite to implementation of the rent increase and thereby delaying the effective date of the increase for an indeterminate period, the FHC has, at the very least, deprived plaintiffs of the use of substantial rent revenues which HUD had already determined were necessary, as of a particular date, to the financial stability of the project.

In this same vein, if I were to accept federal defendants' position that the FHC is not an "other authority" because it has no "direct" control over the rent structure, I question the result that would obtain should the FHC attempt to exercise its power under regulation § 9–804(1)(d) of the Philadelphia Code. That regulation precludes a landlord from altering the terms of an existing lease for "one year after correction of any violations where the action . . . is intended to collect the cost or value of making any or all of the corrections necessary to comply with The Philadelphia Code . . . ." Phila.Ord. § 9–804(1)(d). Query whether the FHC could exercise its authority under this subsection to block an increase approved by HUD based solely on expenditures necessary to correct violations of the local codes. Query further whether a similar rent freeze imposed by the FHC on HUD-owned housing found to be in violation of local codes would not be inconsistent with the regulations that repose exclusive jurisdiction over the "regulation of rents" for HUD-owned projects with HUD. *See* 24 C.F.R. § 403.1(a) (1978). I raise these questions to illustrate the difficulty I perceive were the federal defendants' restrictive definition of "rent regulation" to be accepted and applied consistently throughout Part 403 of the regulations.

Federal defendants' final contention is that the legislative objective behind the housing acts of providing decent housing for low- and moderate-income families militates against a finding that the regulations preempt local code enforcement. In finding for plaintiffs here, I do not rule that the regulations sweep so broadly as to preclude code enforcement entirely. Indeed, I recognize the federal agency's need to rely on local agencies to insure that federally subsidized projects meet the general standards imposed on all local housing units. I do conclude, however, that the local agency may not accomplish its goals by direct interference with the rent structure of federally subsidized housing, as has the FHC here.

Moreover, it does not necessarily follow that the statutory intent to eliminate slums and provide decent housing constitutes the preeminent thrust behind the agency's preemption of local regulation of rents. Indeed, although the avowed object of the legislation is to provide adequate low-income housing, and although the regulatory scheme reposes control over the rent structure with HUD in order to ensure that a reasonable return for the owner of the project will be balanced against a fair rent for the tenants, the regulations themselves evidence that the overriding objective be-

hind preemption of local control over rents is economic. *Cf. Tenants Council of 6101 Morris St. v. USA*, No. 79–2144 (E.D.Pa. April 24, 1980), slip op. at 5 (HUD control over rents in projects under § 202 of housing act seeks to ensure continued financial viability of project by guaranteeing adequate return to cover costs). According to section 403.9 of the regulations, preemption has a three-fold purpose: minimizing defaults by mortgagors, preserving the continued viability of the projects as a source of low-income housing, and protecting the substantial economic interest of the federal government. 24 C.F.R. § 403.9 (1978). This concern for economic stability is similarly reflected in the regulations that apply to insured but unsubsidized housing. There, the local body's control over rents is preempted when HUD determines that the delay or decision of the local authority jeopardizes the federal agency's economic interest in the project. *Id.*, §§ 403.1(a), .5.

Finally, although the federal defendants imply to the contrary, a determination that the regulations preempt the authority of the FHC to suspend rents will not totally undermine its power to enforce the local codes in federally subsidized housing. The FHC still has the power to order the owner of the project to correct the code violations and to punish noncompliance by fine or imprisonment. Phila. Ord. §§ 9–805(3), –806. Admittedly, the threat, to landlords who are in the position of plaintiffs here, of a fine or imprisonment may not be as coercive a mechanism to compel immediate compliance with the codes as is the deprivation of substantial rent revenues. Nevertheless, reliance by the FHC on sanctions other than the prohibited rent freeze permits local code enforcement to coexist with HUD's exclusive control over the rent structure of subsidized housing without sacrificing either the objective of decent low-income housing or the financial stability of the project.[4]

For the reasons outlined above, I reject the federal defendants' interpretation of "other authority" as unduly restrictive. I find the result that they urge to be inconsistent with and unsupported by the regulatory scheme. Accordingly, I conclude that the regulations preempt the jurisdiction of the FHC to act as it has here and that it may not use its power over the rent structure of federally subsidized housing as a mechanism of code enforcement.

### The Damages Claim Against the Federal Defendants

◼ The foregoing conclusion raises the question of the scope of the judgment to be entered. Although plaintiffs have moved only for summary judgment against the FHC, they recognize that a determination in their favor of the preemption question necessarily warrants the entry of summary judgment against the federal defendants, at least on their claims for injunctive and declaratory relief. Plaintiffs' Supplemental Memorandum (Doc. No. 43) at 2; *see, e. g., Davis v. Romney*, 490 F.2d 1360, 1366–67 (3d Cir. 1974). Plaintiffs insist, however, that the favorable determination of the preemption issue does not entirely dispose of their complaint. They argue that a factual issue as to the bad faith of the federal defendants remains with respect to their claim for attorneys' fees and costs. Federal defendants, on the other hand, have moved to dismiss what is, ostensibly, a claim for damages in counts I and II, raising the bar of sovereign immunity.

Precisely what plaintiffs seek to recover under the rubric of attorneys' fees and costs, and exactly why the "bad faith" of the federal defendants is a material issue of fact under the complaint as presently styled, precluding the entry of summary judgment as to the four remaining counts, is not at all clear. If plaintiffs are arguing that the issue of bad faith remains extant

---

4. If the city finds that the present permissible sanctions are without sufficient teeth to achieve the desired result, it is always free to amend its ordinances to provide alternative means of code enforcement, such as a system of fines for types of violations, so long as the mechanisms adopted do not delay, prevent or interfere with the implementation of HUD-approved rent increases.

only to demonstrate their right to recover the counsel fees incurred in this litigation, I conclude that the issue of the federal defendants' bad faith has no relation to the substantive claims in this lawsuit and thus is not properly before me at this time. I will confront that question when and if plaintiffs petition for attorneys' fees. If, however, plaintiffs seek to preserve the issue of bad faith as a predicate for the recovery, as compensatory damages, of costs and counsel fees expended in their pre-litigation efforts to prompt a declaration of preemption by the federal defendants, I conclude that plaintiffs' argument is unavailing. Construing the claim for "reasonable counsel fees and costs incurred in attempting to require the defendants to follow HUD's regulations" as a claim for compensatory damages, I agree with the federal defendants that the claim is barred by the doctrine of sovereign immunity.

In an attempt to counter the federal defendants' claim of immunity, plaintiffs advert to the waiver of sovereign immunity in 28 U.S.C. § 2412 (1976)[5] for costs to a prevailing party in a civil action, to the bad faith exception to the rule against the award of counsel fees in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975),

and to the waiver of sovereign immunity contained in the National Housing Act at 12 U.S.C. § 1702 (1976).[6] Plaintiffs' first two arguments relate to the availability of costs and counsel fees for the instant litigation. Neither can be read to provide the basis for recovery of the pre-litigation expenses that constitutes plaintiffs' claim for damages.[7]

With respect to plaintiffs' third argument, the federal defendants suggest first that the authorization to sue the Secretary does not apply to this action. This contention relies on two major premises. First, the waiver of sovereign immunity outlined at 12 U.S.C. § 1702 (1976) applies only to suits brought to redress violations of the National Housing Act. Second, because the basis of plaintiffs' claim is HUD's failure to assert its preemptive authority under Part 403 of the regulations and because those regulations were promulgated pursuant to section 7(d) of the Housing and Urban Development Act, 42 U.S.C. § 3535(d) (1976), the present action does not arise under the National Housing Act. Inasmuch as plaintiffs' claims for injunctive and declaratory relief do not depend on the Secretary's consent to suit contained in section 1702,[8] I will assume, without deciding, that section 1702 applies to the instant action, at least as a threshold proposition. I conclude, however,

5. This statute provides in pertinent part:
    "Except as otherwise provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity, in any court having jurisdiction of such action. A judgment for costs when taxed against the Government shall, in an amount established by statute or court rule or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by him in litigation."

6. This statute provides in pertinent part:
    "The Secretary shall, in carrying out the provisions of this subchapter and subchapters II [which contains § 221(d)(3)], III, V, VI, VII, VIII, X, IX–A, IX–B, of this chapter, be authorized in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal."

7. I have already concluded in the preceding paragraph of the text that the question whether plaintiffs would be entitled to an award of counsel fees as the prevailing party in this litigation is not presently before me. Accordingly, I do not decide at this time the specific point to which both plaintiffs and defendants have alluded—namely, whether counsel fees under *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), are available against the United States given the language of 28 U.S.C. § 2412 (1976), which expressly excludes the award of counsel fees from the waiver of sovereign immunity.

8. Plaintiffs also sought relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 (1976), which, under the decision by the Court of Appeals for the Third Circuit in *Jaffee v. United States*, 592 F.2d 712 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), waives sovereign immunity in actions for injunctive and declaratory relief brought under 28 U.S.C. § 1331.

that section 1702 does not waive sovereign immunity for the damages claimed here.

■ Because waivers of sovereign immunity are to be strictly construed, the statutory authority to sue federal officials does not necessarily operate as a complete waiver of the sovereign immunity of the United States. *Marcus Garvey Square, Inc. v. Winston Burnett Construction Co.*, 595 F.2d 1126, 1132 (9th Cir. 1979). Noting that section 1702 limits recovery of money damages to funds within the agency's possession and control, the court in *Marcus Garvey Square* concluded that the waiver of immunity in section 1702 does not extend to the recovery of damages against the United States. *Id.* at 1131–32 (relying on *FHA, Region 4 v. Burr*, 309 U.S. 242, 250, 60 S.Ct. 488, 492, 84 L.Ed. 724 (1940)).

■ Under the analysis of *FHA, Region 4* and *Marcus Garvey Square, supra*, plaintiffs' claim for damages is cognizable only if recovery can be had from the defendant officials individually or from funds in the agency's possession and control, as opposed to recovery from the United States Treasury. Plaintiffs' damages claim does not meet this test. Whatever may be the significance of plaintiffs' recent charges of bad faith on the part of HUD officials, plaintiffs expressly do not seek to hold the federal defendants individually liable. Nor do plaintiffs clearly point to specific funds within the agency's control that have been earmarked as a source of recovery for claims of this type. With the action in this posture, I can only conclude that plaintiffs' claim for damages runs directly against the United States and is barred by the doctrine of sovereign immunity.[9]

Accordingly, I will grant federal defendants' motion to dismiss the damages claims in counts I and II, and I will enter summary judgment for plaintiffs on their claims for equitable relief in counts I–IV.

**9.** The cases upon which plaintiffs rely do not persuade me otherwise. Without delving into the merits of those cases, I simply conclude that they are inapposite to this case. Plaintiffs here do not, as did plaintiffs in *Griffin v. Harris*, 480 F.Supp. 1072, 1074 (E.D.Pa.1979), advance an equitable theory of recovery. They merely allege a violation of the regulations, which re-sulted in substantial expenditures on their part. Nor is there here, as there was in *Estrada v. Hills*, 401 F.Supp. 429 (N.D.Ill.1975), the failure to discharge a plainly ministerial duty. This controversy centers around the interpretation of regulatory language, which involves the exercise of judgment and is obviously a discretionary function.

## ORDER

This 1st day of May, 1980, it is ORDERED

1. Federal Defendants' Motion to Dismiss plaintiffs' claims for damages in Counts I and II is GRANTED and the respective claims in Counts I and II are DISMISSED with prejudice.

2. Federal Defendants' Motion to Dismiss or in the Alternative for Summary Judgment on Counts I, II and IV is, in all other respects, DENIED.

3. Plaintiffs' Motion for Summary Judgment is GRANTED on all remaining counts and against all defendants.

In accordance with the foregoing disposition of the complaint, it is hereby ORDERED, ADJUDGED, AND DECREED that:

1. HUD regulations at 24 C.F.R. §§ 403.1 to .12 (1978) preempt the jurisdiction of defendant Philadelphia Fair Housing Commission to suspend HUD-approved rent increases or to in any way delay, prevent, or interfere with the implementation of said increases in the federally subsidized housing project known as Woodhaven Gardens.

2. The Philadelphia Fair Housing Commission

(a) is ENJOINED from asserting jurisdiction over the rent structure at Woodhaven Gardens for any reason;

(b) shall direct the Urban League to release to plaintiffs all rent increases from Woodhaven Gardens presently held in escrow; and

(c) shall advise tenants at Woodhaven Gardens that it was and is without jurisdiction to order the suspension of HUD-ap-

proved rent increases and that tenants must pay said increases to plaintiffs in their next monthly payment from and after this date if they are not doing so presently.

3. The defendant United States Department of Housing and Urban Development and defendant federal officials

(a) shall instruct HUD officials charged with administering said regulations in the Philadelphia area that said regulations preempt the jurisdiction of the defendant Commission insofar as the Commission attempts to delay, prevent or interfere with the implementation of HUD-approved rent increases at Woodhaven Gardens; and

(b) shall take all reasonable steps to insure that this mandate is carried out.