*159 OPINION OF THE COURT
Richard Lee Price, J.
This case involves approximately 100 nonpayment proceedings brought by the landlord petitioner, Tower West Associates (hereinafter referred to as Tower West), against those of its tenants who, at the time of initiation of these proceedings, were participating in a rent strike, which began in October, 1980.
The trial in this case proceeded from September 16,1981 through November 24, 1981 in Trial Term, Part II. Testimony was presented by approximately 10 witnesses, appearing and being recalled for the respective parties. A wealth of documentary material was offered and received in evidence.
BACKGROUND OF THE TOWER WEST PREMISES
The premises that are at the very heart of this litigation are located in a building at 65 West 96th Street in Manhattan. This 29-story apartment building is composed of 217 dwelling units. The building was constructed in 1971 under New York City’s Mitchell-Lama program for low and middle income tenants. The rents that prevail at Tower West are comparatively low for the Manhattan area. This apparent bargain, however, is mitigated by the fact that residents must meet certain income level requirements (tenants may not earn over prescribed income levels) in order to be eligible to live in the apartments.[1]
For reasons that are, at this juncture, unimportant, Tower West was subsequently refinanced through the Federal Government’s active assistance program of the National Housing Act[2] and, eventually, supervision of the project passed from the city’s Housing Development Administration to the United States Department of Housing and Urban Development (HUD).
The petitioner landlord, in its papers, characterizes Tower West as a “luxury” apartment house in a “fashionably avant-garde neighborhood” complete with “three elevators, a computer system, a parking garage, a laundry *160 room, a community room, an intercom system, a closed-circuit T.V. security system, a lobby, a vestibule, side-door entrance, fluorescent and incandescent exterior lighting, playground, plaza and on-site 24-hour armed security guard, one handyman and five porters”.
The tenants, on the other hand, do not dispute the dormant existence of these services. While the petitioner landlord accuses the tenants of instituting the rent strike solely because of the proposed HUD-approved October 1, 1980 rent increases and the tenants’ opposition to “gentrification” of the neighborhood, the respondent tenants accuse the landlord of neglect and subsequent sought-for justification on the basis that the premises are “luxury” and therefore any diminution in services is merely a de minimus inconvenience.
ARGUMENT OF THE CASE
In this action for nonpayment, petitioner landlord affirmatively puts forth the argument that Federal law preempts a State court from adjusting rent increases approved by HUD. The landlord petitioner’s second argument, put forth defensively in response to the tenants’ counterclaim of a breach of the warranty of habitability, argues that alleged deficiencies in services and conditions, even if substantiated, do not reach the level of a breach of the implied warranty of habitability. The respondent tenants’ polemical powers are spent interpreting all available data on the boundaries and limitations of the warranty of habitability and applying those interpretations favorably to the present situation. As a result of this alleged breach, the tenants seek a rent abatement.
THE PRE-EMPTION ARGUMENT
The landlord petitioner asserts the following with typical assurance: “The same principles that preclude the court from directly invalidating the rent structure [as set by HUD] preclude it from indirectly so doing by granting a rent abatement”. This statement is, of course, in reference to HUD language providing for pre-emption of “the entire field of rent regulation by local rent control boards * * * or *161 other authority, acting pursuant to state or local law as it affects projects covered [by HUD].”[3] (Emphasis added.)
The landlord petitioner cites a number of cases to support the above contention, including Bronstein v Philadelphia Fair Housing Comm. (488 F Supp 1357). In that case, a municipal administrative agency attempted to prevent certain rent increases approved by HUD from taking effect. This attempt was made by the agency because of alleged violations of the municipal fire and housing codes. The municipal agency, empowered to enforce its codes through maintenance of rents at the status quo, directed the tenants to pay all increases into an escrow account. The court held that the municipal agency was clearly an “other authority” and therefore its powers were pre-empted pursuant to HUD regulations.
As the landlord petitioner correctly notes, this court has previously ruled on this argument — at least peripherally. At this point, the court remains unimpressed and unpersuaded by the authority cited herein by petitioner. Bronstein is clearly distinguishable. The tenants in the present case are merely seeking to redress their grievances through utilization of the court system. This is not an instance of a “municipal authority” seeking to upset the rent structure as laid down by HUD. This court, if it so decides, will simply be granting a rent reduction for diminution of services or an amount of damages for injuries sustained thereby.
BREACH OF IMPLIED WARRANTY OF HABITABILITY
The bulk of testimony given and evidence received at trial was presented to substantiate or refute the respondent tenants’ claim of a breach of the implied warranty of habitability. The determination necessary here is twofold: (1) Does the evidence presented, on the whole, establish a breach of the warranty of habitability? and, if so, (2) What amount of damages or “rent abatement” does the evidence justify?
Clearly, the determination necessary mandates not only a finding regarding liability, but also one of damages.
*162 The leading case in the area is Park West Mgt. Corp. v Mitchell (47 NY2d 316, cert den 444 US 992). In that case, the New York Court of Appeals held that a landlord, while not an insurer of the premises, impliedly warrants that (1) the premises will be fit for human habitation, (2) the condition of the premises is in accord with the uses reasonably intended by the parties, and (3) the tenants are not subjected to any conditions endangering or detrimental to their life, health or safety. The court expressed the paramount purpose of the implied warranty of habitability as a means by which a tenant will be placed in a more equitable bargaining position vis-a-vis the landlord.
The requirements of Park West have been extensively explained and. expanded in subsequent case law. One such case has channeled the mandates of Park West into simpler categories. The implied warranties are that housing is: (1) Not dangerous to life, health or safety; (2) Habitable and usable; (3) In accord with reasonable expectations. (Mantica R Corp. NV v Malone, 106 Misc 2d 953.)
Mantica speaks of these three “branches” of the implied warranty of habitability in the disjunctive sense. In other words, the warranty may be breached by a violation of any one branch. It is this court’s opinion that while a violation may occur (and liability found) when any one branch is violated, the damages available under the various branches may vary according to the branch category violated and/or the seriousness of the breach.
Other cases have addressed the issue of the cumulative effects of a number of what may be termed “minor” lapses. In one case, the court held that the landlord’s action in firing both a full-time superintendent and a full-time handyman, which led to a failure to provide, at various times, heat, hot water, elevator service, security (by failing to repair a broken front door lock), and garbage collection and disposal, amounted to a breach of the implied warranty of habitability. (111 East 88th Partners v Simon, 106 Misc 2d 693; see, also, Concord Vil. Mgt. Co. v Rubin, 101 Misc 2d 625.)
Concomitantly, in Alcoma Corp. v Whitman (NYLJ, Aug. 30, 1976, p 6, col 6), the court held that a landlord did not breach the warranty of habitability when, because of a *163 strike, the tenants were without doorman and garbage removal services for 17 days.
In the case at bar, the tenants have established, to this court’s satisfaction, that a deficiency in various services did exist prior to and at the time of the initiation of the rent strike on October 1, 1980. This court is of the opinion that the record in this case, taken as a whole, supports a finding that there was a failure by the landlord to provide the amount of security bargained for (through a failure to repair door locks and to maintain a properly functioning intercom system) and properly functioning passenger elevator service. The court also finds that there is some evidence of a failure to provide reliable heat and hot water.
It is at this point necessary to consider petitioner’s argument that, assuming, arguendo, the afore-mentioned deficiencies do exist, said deficiencies are clearly de mini-mus and cannot form a basis for actionable relief. While such an argument could be competently answered by reference to the “cumulative effects” line of cases, 111 East 88th Partners and Concord Vil. (supra), this court does not choose to so refer. Rather, this court considers the cumulative burden of the daily, unnecessary annoyance and inconvenience that may be occasioned by an arguably minor deficiency in a comparatively minor service (e.g., elevator service is arguably minor when compared to lack of heat, water or sanitation services) over a long period of time.
A tenant entering into a leasehold relationship with a landlord has the right to expect not only shelter and the services attendant thereto, but the reliability of those services. The severity or extent of the deficiency goes toward the issue of damages, not liability.
Therefore, on the basis of facts introduced at trial, the landlord is liable for a breach of the implied warranty of habitability.
In finding this admittedly minor breach of the warranty of habitability, this court considers it necessary to respond further to the landlord’s characterization of the failure of services at Tower West as de minimus.
The concept of the “urban” tenant — first recognized in Park West — encompasses not only the underprivileged *164 tenant, who must combat conditions such as rodent infestation, broken stairwells, and potential lead poisoning from peeling paint, but also the middle class tenant — the tenant who is not poor enough to elicit the customary sympathies and attention of the public and the media, nor wealthy enough to garner the necessary influence to move the powers that be.
Is it not enough that the middle class (or any) individual must deal with the everyday frustrations and inconveniences of a job, the mass transit system, and other fallible public services and facilities, without also allowing similar frustations to invade the home?
The court in Park West (47 NY2d 316, 323, supra) speaks of the need of the urban tenant to be afforded the requirements of “heat, light, water, sanitation and maintenance.” In addition to these basic corporeal needs of the urban tenant, it is clear that individuals also have certain emotional and psychological needs, most specifically the need for the dependability and reliability of those basic services.
This court is fully cognizant of and responsive to the fact that there is competent evidence indicating that the landlord did, in good faith, seek to remedy the miscellany of ills that befell this apartment building. While this court does consider this evidence on the damages issue, the court notes that good faith attempts on the part of a landlord to repair conditions and/or services do not constitute a defense to a breach of the warranty of habitability. (Leris Realty Corp. v Robbins, 95 Misc 2d 712.)
Resolution of the damages issue — how much rent abatement or other damages do we allow? — presents a much more complex problem. This problem exists because, while the evidence does establish a “pattern of unreliability of services”, and this unreliability has its effect upon the safety and health of the tenants, therefore sustaining a finding of a breach, the evidence presented by the tenants is of such a nebulous and inconcrete character as to greatly hamper this court’s ability to assess damages.
The mere fact that damages sustained by a tenant in a breach of the warranty of habitability situation are not susceptible to precise determination does not preclude liability on the part of a landlord for the breach. (Park West *165 Mgt. Corp. v Mitchell, 47 NY2d 316, cert den 444 US 992, supra; McGuiness v Jakubiak, 106 Misc 2d 317.) However, a deficiency in the evidence will affect the amount of rent abatement given or damages awarded. (Goldner v Doknovitch, 88 Misc 2d 88.)
In Park West the court stated (supra, p 329): “In ascertaining damages, the finder of fact must weigh the severity of the violation and duration of the conditions giving rise to the breach as well as the effectiveness of steps taken by the landlord to abate these conditions.”
The defects in the evidence presented by the tenants number more than one. The most basic problem is the nonexistence of any logs or records, of any sort, kept by any tenant with respect to any malfunction in services or conditions. While the oral testimony of a witness with regard to certain conditions is probative if believed, it is not as susceptible to a translation into damages as records kept, which memorialize those conditions in writing. Oddly enough, the strongest documentary evidence is the letter of managing agent Grenadier Realty Corp.’s Robert Rosenberg outlining the problems at Tower West.
Furthermore, while the tenants have made a number of claims with respect to the lack of or too much heat, and the extreme temperature of hot water, neither the tenants nor any of their “expert” witnesses could produce any temperature readings of either residential climate or water.
Additionally, the court notes that while the tenants have repeatedly claimed that door locks and lights were broken on numerous occasions, they have failed to produce any photographs evidencing those conditions.
Finally, the court weighs against the tenants’ claim for a rent abatement and/or damages evidence introduced by Tower West that there was no record of any complaint made by the testifying tenants registered with either Tower West or the central complaint bureau.
The failure of the tenants to present logs, photographs, temperature readings, and the nonexistence of registered complaints, while not dispositive on the issue of liability, clearly reduces the amount of rent abatement and/or damages available to the tenants.
*166 In light of the above, and in light of competent evidence that the landlord, in good faith, did attempt to remedy defective conditions and services, this court awards the tenants damages in the amount of 10% of their rent for a three-month period. It is also important to note that most of the alleged deficiencies in services and conditions no longer exist, having been repaired by the landlord. A court may assess damages, as opposed to awarding an abatement of rent due to a diminution of the value of a dwelling caused by the absence of bargained for services. (Goodman v Ramirez, 100 Misc 2d 881.) This court awards “tort-like” damages rather than a “contractually based” rent abatement because of its inability to determine precisely the extent of the loss of services for precise periods of time. The damages awarded here are allowable and determinable under a theory similar to an allowance of damages for “pain and suffering” or mental distress. (See Stern v Hotel Carter, NYLJ, Feb. 26, 1980, p 6, col 2.)
LANDLORD PETITIONER’S MOTION FOR PAYMENT OVER OF INTEREST PAYMENTS EARNED BY TENANTS ON WITHHELD RENT MONEYS
The landlord petitioner, in one of the more recent motions on this case, requests that all amounts earned by the tenants (through the tenants association) on the withheld rent moneys, as a result of an apparently wise investment, be turned over to the landlord. The issue, as presented, appears to be one of first impression.
The landlord puts forth a number of viable arguments in support of its motion for the return of the interest payments. The more cogent of these arguments follow:
(1) The rent “strike” initiated by the tenants is unlawful because it does not comply with the requirements of RPAPL article 7-A, and therefore any interest earned on the wrongfully withheld moneys is due and owing the landlord;
(2) The burden of establishing a breach of the warranty of habitability is on the tenants and therefore they have no right to “use” the money until their rights to it are shown to exist;
*167 (3) Disbursement of the interest funds amounts to a “prejudgment attachment” without court authorization, which the tenants are not entitled to unless they establish a right based upon either (a) the need to use the money to maintain essential services, or (b) the need to provide a fund out of which to pay a potential judgment;
(4) Disbursement of the interest funds circumvents the purpose of RPAPL article 7-A;
(5) Disbursement encourages tenants to prolong rent strikes for the maximum period of time in order to gain the maximum return on an investment;
(6) A general objection based on the theory of “unjust enrichment”, and
(7) The tenants are entitled, in any event, to no more than the interest earned upon a portion of the withheld funds, because the tenants are claiming no more than approximately a 55% rent abatement. (The 55% figure was arrived at by adding together the percentages regarding diminution in various services, set forth in the tenants’ testimony.)
The court will address each of the landlord’s arguments in turn, noting at the outset the seriousness of the issue and the court’s recognition of the landlord’s legitimate concern with regard to possible future rent withholdings.
To begin with, the collective withholding of rent is not per se unlawful simply because it does not comply with the procedures set forth in RPAPL article 7-A. (See, e.g., Park West Mgt. Corp. v Mitchell, 47 NY2d 316, cert den 444 US 992, supra.) Tenants may be successful on a counterclaim of a breach of the warranty of habitability even if they have failed to comply with the requirements of that statute. Contrary to the landlord’s belief, a failure to comply with that statute does not thereafter taint any use made by the tenants of rent money, a part of which they may be entitled to, withheld in good faith.
Similarly, merely because a tenant has the burden of proof on its counterclaim of a breach of the warranty of habitability, this fact does not necessarily lead to the conclusion that until a determination has been made the *168 tenants must avoid any investment of money withheld in good faith.
With respect to the landlord’s argument concerning “prejudgment attachment without court authorization”, this court would first state that it is not of the opinion that, in'the present case, investment of the money constituted prejudgment attachment. Secondly, even if the court were to so consider it, the investment is considered necessary to insure that this suit, brought in good faith by the tenants, would continue.
As to the landlord’s fourth argument, this court holds that, in the present case, allowing the tenants to retain the interest payments does not circumvent the purpose of RPAPL article 7-A. The tenants have proceeded in good faith and have, at all times, responded properly to all directions given and orders issued by this court with respect to the moneys withheld.
In a related vein, this court does not believe that an allowance to the tenants of the interest payments has prolonged this litigation. Clearly, the tenants are using the money to pay attorneys’ fees — they do not appear to be personally enriched and are, no doubt, also anxious to see this matter resolved. Rather than encouraging the tenants to prolong the litigation, it would appear to this court that in this case the availability of the interest money has allowed the tenants to proceed. In light of recent developments awarding tenants attorneys’ fees when successful in breach of the warranty of habitability actions, this court sees no reason to upset the earlier disbursements of funds. (See Concord Vil. Mgt. Co. v Rubin, 101 Misc 2d 625, supra.)
The landlord’s argument that the tenants are being “unjustly enriched” is similarly, and summarily, rejected.
The landlord’s final argument that, at the most, the tenants are only entitled to the interest earned on the highest possible disputed percentage of the rent — here, 55% — is the most creative and potentially successful argument put forth by the landlord. It is quite possible that, at an earlier stage of the proceedings, in another case, this court might direct that the tenants are only entitled to *169 invest the disputed percentage of rent. But that is clearly a matter within the discretion of the court as the Trial Judge.
The practical difficulty with the above theory, however, is that by the time the court is made aware of the extent of the percentage rent abatement requested, the tenants will already have invested the money and disbursed the interest funds. This court will not, at this point, and under these facts, make an after-the-fact determination and order the remittance of approximately 45% of the interest moneys earned.
Although the court is fully aware of the legitimate objections expressed by the landlord, this court will not direct a return of interest moneys earned and disbursed by these tenants who have in good faith withheld their rents on the basis of a breach of the warranty of habitability.
Upon full consideration of the above facts this court holds that the landlord petitioner is entitled to receive all rents previously withheld and not paid over pursuant to a previous order of this court, and to receive all future payments of rent.
Furthermore, the respondent tenant is entitled to damages in the amount stated above, for breach of the warranty of habitability, said amount to be subtracted from the amounts due and owing the landlord petitioner by reason of monthly rent.
All relief requested and not specifically disposed of is hereby denied. No costs are awarded to either side.

. Private Housing Finance Law, art 2, § 10 et seq.

. US Code, tit 12, § 1701 et seq.

. 24 CFR 403.9 (former).