15 F.3d 1159
 304 U.S.App.D.C. 428
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
Elaine JOHNS, et al.
v.
A. Bruce ROZET, et al., Appellants
 No. 92-7095.
 United States Court of Appeals, District of Columbia Circuit.
 Dec. 30, 1993.
 
 Before MIKVA, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This appeal was considered on the record from the United States District Court for the District of Columbia, on the briefs of counsel, and on oral argument. The arguments have been accorded full consideration by the court and occasion no need for a published opinion. See D.C.Cir.Rule 14(c). For the reasons stated in the accompanying memorandum, it is
 
 
 2
 ORDERED and ADJUDGED that the district court's judgment from which this appeal has been taken be affirmed.
 
 
 3
 The clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 15.
 
 MEMORANDUM
 
 4
 This is a challenge to a jury verdict in favor of the plaintiff class for breach of implied warranty of habitability and fraud. Defendants A. Bruce Rozet and Deane E. Ross (doing business through defendant AFC) controlled several corporations that owned an interest in the Tyler House housing project on North Capitol Street. Plaintiffs are a class of Tyler House residents. At trial, plaintiffs prevailed against all three defendants on the implied warranty claim, and against AFC on the fraud claim. Defendants appeal, asserting as error that: (1) defendants were not "owners" liable for breach of implied warranty under D.C. statute; (2) even if they were "owners" for some period, they could not have been owners after May 30, 1989 when their corporation declared bankruptcy, and the trial judge should not have admitted evidence as to conditions in the project after that date; (3) the trial court misapplied the standard for measuring damages for breach of the implied warranty of habitability, and erroneously excluded expert testimony that would have established the true value of the property; (4) the relief granted by the district court on the implied warranty claim is preempted by federal law; and (5) there was no representation or reliance to support plaintiffs' fraud claim. We affirm the trial court's judgment and its underlying jury verdict.
 
 
 5
 A. Were Defendants "Owners" of Tyler House Before the Bankruptcy?
 
 
 6
 For the defendants to be liable for breach of the implied warranty of habitability, they must have been "owners" of the premises under the D.C.Housing Code. The Code defines "owner" as:
 
 
 7
 any person who, alone or jointly or severally with others, meets either of the following criteria:
 
 
 8
 (a) Has legal title to any building arranged, designed or used (in whole or in part) to house one or more habitations; or
 
 
 9
 (b) Has charge, care, or control of any building arranged, designed, or used (in whole or in part) to house one or more habitations, as owner or agent of the owner, or as a fiduciary of the estate of the owner or any officer appointed by the court. Any persons representing the actual owner shall be bound to comply with the terms of this title and any notice or rules and regulations issued pursuant to this title, to the same extent as if he or she were the owner.
 
 
 10
 14 D.C.M.R. Sec. 199.1.
 
 
 11
 Defendants are not subject to paragraph (a), because they did not hold legal title to Tyler House--their now-bankrupt corporations did. But under paragraph (b), a person who has "charge, care, or control ... as owner or agent of the owner" can be an "owner" even if he does not hold legal title. See District of Columbia v. Eck, 476 A.2d 687, 688 n. 1 (D.C.1984). Therefore, if the jury found that defendants were owners because they had actual control of Tyler House "as owners" then the verdict must be sustained.
 
 
 12
 But defendants argue that the district court's instruction allowed for a broader definition of "owner" than the Code permits. The district court instructed the jury that an owner can be "any person who has charge, care, or control as owner or agent of the owner of any building arranged, designed, or used to house one or more dwelling units." The court further instructed that if the jury found that any of the defendants had "charge, care, or control of Tyler House, or were representatives of either THAL or PISI, then [the jury] must find that any one or all of them were owners of Tyler House." (Emphasis added.) Finally, with respect to ownership of Tyler House after the record owners declared bankruptcy, the district court charged the jury that if it found that the defendants were owners of Tyler House before bankruptcy,
 
 
 13
 you should consider whether the defendants continued to be responsible as owners, as I have just described the term, after bankruptcy filing on May 30, '89. You should determine whether the defendants had charge, care, or control of Tyler House as owner or agent of the owner between May 30, '89, and August 4, '89.
 
 
 14
 Defendants read the court's instruction to construe "owner" to include any "person[ ] representing the owner," regardless of whether the representative had "charge, care, or control." Defendants interpret the Code's language, "persons representing the actual owner" to mean that a representative of the owner must comply with relevant provisions of the Code; but they argue that it does not expand the definition of the word "owner" to make a "representative" independently liable. (Presumably the actual owner is liable, under the defendants' interpretation, for his representative's infractions, but the representative is not liable for her own.) Defendants object that under the court's interpretation practically any employee might be a "person representing the actual owner," who would be treated as an owner under the Housing Code.
 
 
 15
 Although the district court's instruction was somewhat hazy, we do not think the jury could have believed the definition of "owner" covered any employee of the actual owner. Reading the court's instruction as a whole, it limits the definition to those who, like defendants, seek to avoid the sanctions of the Housing Code through corporate formalities. See generally Anderson v. Abbott, 321 U.S. 349 (1944) (limited liability for corporate form not absolute where corporation is undercapitalized and limited liability frustrates public policy). The instruction thus treats the issue of whether defendants were owners under the Housing Code as essentially an exercise in "piercing the corporate veil."
 
 
 16
 In the context of this case, the judge's discussion of piercing the veil should have made it clear that the issue was whether defendants were in direct control of the premises as alter egos of the corporations holding record title, and not merely whether they were "representatives" of those corporations in some broader sense. Thus, we need not decide whether a broad construction of the Code's "persons representing the owner" language would be a proper interpretation of the statute, because the district court's construction was not as broad as defendants assert. Indeed, we think the court's construction was narrow enough to pass muster under any plausible reading of the Code.
 
 
 17
 B. Were Defendants "Owners" After the Bankruptcy?
 
 
 18
 On May 30, 1989, during the pendency of a previous Superior Court litigation, the record owners of Tyler House (entities controlled by defendants) declared bankruptcy, and a trustee was appointed. The trustee succeeded to the formal control of Tyler House. See 11 U.S.C. Sec. 704(2). Plaintiffs argued, however, that this transfer of formal control did not end defendants' "ownership" of Tyler House for purposes of the D.C.Housing Code, because defendants continued to exercise actual control over the property. The district court allowed the jury to decide whether defendants continued as "owners"; the jury found that they did. Defendants now challenge this ruling as a matter of law, arguing that they could not possibly have continued as "owners" because the bankruptcy trustee became responsible for remedying the conditions at the project. They argue that the trial judge erred in allowing the issue to go to the jury, and that he erred in allowing evidence to be submitted as to the condition of Tyler House after May 30, 1989.
 
 
 19
 We are not persuaded. The question is not whether defendants had record title or formal legal control--they never had that in the first place, and they still didn't have it when the trustee took over. The question is whether they were "owners" within the meaning of the Housing Code. They were "owners" if they continued to exercise actual "charge, care, or control" of the premises "as owners." Transfer of formal title to a trustee does not necessarily preclude this finding. Therefore, in the face of evidence that defendants did, in fact, continue to act as actual owners after the bankruptcy, the district court permissibly treated the issue as one of fact for the jury.
 
 
 20
 The defendants' argument that they cannot be liable for rent they did not collect is equally unavailing. They argue that, while breach of the warranty of habitability is remedied by return of rent wrongly collected, once the bankruptcy trustee was appointed he, not they, collected rent. Therefore, the defendants contend that they cannot "return" rent they did not collect. This argument disregards the function of the bankruptcy trustee. The trustee does not collect rent for his own benefit; he collects it to pay the debts of the bankrupt. Thus, the trustee's collection of rent and disbursement of the money to Tyler House's creditors accrued to the benefit of the owners of Tyler House--the defendants. Accordingly, requiring them to "return" the money is entirely equitable.
 
 C. Measurement of Damages
 
 21
 Plaintiffs sought a rent reduction as their remedy for breach of the implied warranty of habitability. The ordinary method of measuring damages is to compute the difference between the amount of rent each tenant has paid and the actual market value of the premises in as-is condition. This formulation compensates the tenant for having paid too much because of the landlord's breach. In this case, however, the district court used a different method. Because Tyler House is federally subsidized, each tenant pays only a portion of her rent; HUD pays the rest. Defendants' method of computing damages (which assumed that any overpayment was HUD's overpayment, and not the tenants') would leave many tenants with nothing.
 
 
 22
 Therefore, the district court rejected the defendants' method as inequitable. Instead, it accepted the plaintiffs' alternative method of percentage reduction, whereby the jury was asked to calculate the percentage by which the breach reduced the plaintiffs' rental obligations. The jury decided that the rent should be reduced by 87 percent, and each tenant therefore recovered 87 percent of the rent she personally paid, regardless of the HUD subsidy.
 
 
 23
 If the tenants had been paying the entire rent, there would be no dispute about damages: defendants would be on the hook for the entire cost of the breach--considerably more money than they are paying here. Because these tenants are subsidized, and because HUD is not a party to this case, defendants' method of recovery would allow them to pay even less, thereby evading the obligation to make full restitution to the victims of their Housing Code violations. Indeed, under defendants' method of computing damages many of the tenants who suffered from the deplorable conditions at Tyler House would recover nothing at all. The Superior Court has rejected a similar argument on one occasion, applying a percentage remedy in an analogous case. Multi-Family Management, Inc. v. Hancock, 121 Daily Wash.L.Rptr. 837 (D.C.Super.Ct.1993) (percentage remedy is a "fair and equitable resolution"). Therefore, the percentage remedy is not only more equitable, but it is also the law of the District of Columbia.
 
 
 24
 Defendants further argue that the district court erroneously excluded their proffered expert testimony. The expert appraiser would have testified to the as-is market value of units in similar projects. But the expert never visited Tyler House; he offered only to testify to the value of other projects that may have been similarly situated. Not having seen the conditions at Tyler House, he could not testify accurately as to the value of the apartments there. Consequently, the district court could reasonably exclude the testimony for inadequate foundation. The only issue here was the percentage reduction in value of the units at Tyler House itself, and the expert's grasp of that issue was materially compromised. Accordingly, the district court properly exercised its discretion to exclude the appraiser's testimony.
 
 D. Federal Preemption of the Court's Remedy
 
 25
 Defendants argue that a rent rebate under D.C. law is inconsistent with federal standards of rent-setting and is therefore preempted. Rents at Tyler House were set by HUD, and defendants were required to charge precisely those rents under section 8 and section 236 of the National Housing Act. 12 U.S.C. Sec. 1715z-1 et seq. The statute seeks to encourage private owners to provide public housing, and so it ensures that the rent will be sufficient to cover operating expenses. HUD regulations interpreting the Act specifically preempt state and local government regulation of rents at federally subsidized projects. 24 C.F.R. Sec. 246.1.
 
 
 26
 But these regulations do not preempt a judicially-imposed retroactive rent abatement. The abatement remedy is not a local government's attempt to control rents; it is a court order of restitution for services not rendered. It does not mandate what the rent should be for any particular unit; instead, it refunds some of the rent already paid for failure to honor a contractual duty to maintain the premises. As such, it is distinct from prospective rent-setting by municipal agencies, and it does not encroach upon the domain of the federal housing laws. The precedent, particularly in the Superior Court, accords with this view. See Tyler House Tenant Council v. Tyler House Apts., Ltd., 118 Daily Wash.L.Rptr. 2033 (D.C.Super.Ct.1990); Conille v. Pierce, 649 F.Supp. 1133 (D.Mass.1986), vacated on other grounds, 840 F.2d 105 (1st Cir.1988), Tower West Associates v. Derevnuk, 114 Misc.2d 158, 450 N.Y.S.2d 947 (N.Y.Civ.Ct.1982). Cf. Bronstein v. Philadelphia Fair Housing Comm'n, 488 F.Supp. 1357 (E.D.Pa.1980) (Fair Housing Commission preempted from suspending HUD-approved rent increase due to housing code violations). We find that the relief granted in this case was not preempted by federal law.
 
 E. Sufficiency of the Fraud Claim
 
 27
 The jury found in favor of the plaintiffs against AFC on the claim that AFC defrauded plaintiffs by inducing them to rely on knowingly false representations contained in a Superior Court consent decree--representations that AFC intended to remedy the uninhabitable conditions at Tyler House. Defendants argue that the fraud claim is insufficient as a matter of law because (1) no "representations" were made, and (2) even if AFC made representations, there was no showing that each member of the plaintiff class relied on them.
 
 
 28
 We need not decide these issues in this appeal. The jury was asked to determine damages in the amount of a percentage rent reduction for either the implied warranty count or the fraud count. The fraud claim was an alternative ground of recovery against AFC, but it led to no damages that were not already assessed under the breach of implied warranty claim. Therefore, because we uphold the implied warranty claim we need not reach this alternative ground of recovery. The jury's verdict below is affirmed.
 
 
 29
 STEPHEN F. WILLIAMS, Circuit Judge, concurring in part and dissenting in part:
 
 
 30
 I concur in the judgment in most respects, but write separately because my grounds for affirmance on one issue are different from the majority's and because I dissent from the judgment on another.
 
 
 31
 First, the ownership instructions ought to withstand the defendants' challenge, not because the instructions as a whole correctly limit liability to those in actual or de facto control, but rather because the error in the instructions was harmless under Fed.R.Civ.P. 61. To say that the instructions as a whole would enable a juror to assess liability only if it found the defendants to be alter egos of the underfunded record owners patently ignores that the district court phrased the relevant passage in the disjunctive. ("Now if you find that [defendants] had charge, care or control of Tyler House or were representatives of either THAL or PISI, then you must find that any one or all of them were owners of Tyler House." JA 276.) The statute does not define representatives as owners, but merely states that "[a]ny persons representing the owner shall be bound to comply ... to the same extent as if he or she were the owner." 14 D.C.M.R. Sec. 199.1. But given the instructions, a juror theoretically could have imposed a broader, common sense notion of "representative" to hold a person liable who did not have either actual or de facto control over the premises.
 
 
 32
 Nonetheless, the evidence presented to the district court overwhelmingly showed that defendants did possess the requisite control over Tyler House, bolstered by the fact that defendants admitted as much on several occasions. In view of the strength of the evidence on the correct theory, the likelihood that the district court's error accounted for the jury's findings seems so remote that it did not affect the defendants' substantial rights. Fed.R.Civ.P. 61; Friends of Keeseville, Inc. v. F.E.R.C., 859 F.2d 230, 234 (D.C.Cir.1988) (reversal requires legal error to have "materially diminished one party's chance of success").
 
 
 33
 Second, I disagree with the majority's conclusion respecting the post-bankruptcy period. The plaintiffs bore the burden of showing that defendants were "owners" in the post-bankruptcy period; that is, that they exercised "charge, care or control" over the premises. The evidence is insufficient to support such a finding. The court relies on two very slim assertions of authority--that defendants, in both a meeting with HUD and correspondence with "federal officials", referred to themselves as "owners" and that defendants continued to make promises to Tyler residents in the matter of repairs. Neither of these assertions of authority is capable of vesting "charge, care or control" of Tyler House in the defendants. Instead, the bankruptcy trustee was indisputably the entity in control and could at any time have prevented the defendants from exercising any control over Tyler House. Once the record owners were in bankruptcy, the task of "piercing the corporate veil" became moot, for the defendants could only succeed to the amount of control that the undercapitalized shells were capable of exercising; in this case, none. Certainly if the trustee had allowed Tyler House to become even worse than its condition on the first day of bankruptcy, DC's Housing Code would not assume that defendants possessed the requisite control as owners to hold them liable for the increased deterioration at the hands of the trustee. I see no difference in this case.
 
 
 34
 More importantly, the remedy awarded to the plaintiffs was in the form of rent "abatement"--return of a portion of rents collected. During the bankruptcy period, the trustee collected the rent, not the defendants. The statute does not authorize courts to order defendants to "return" something they never collected. The majority asserts that the benefit of the rent accrued to the defendants as owners of the entity whose debts were paid, so that there is no harm done in allowing recovery of the so-called rent "abatements" from them. The theory, as best I can understand it, is that persons or firms closely associated with a bankrupt may be treated as the bankrupt's alter ego even though they are not close enough to the bankrupt to have been brought into the bankruptcy process. As a general matter this seems to me a rather breezy dismissal of the procedures established by Congress for handling bankrupts' property and the claims of creditors. Moreover, to the extent that the majority theory is correct, it may raise doubts about our jurisdiction over this case. See, e.g., St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688 (2d Cir.1989) (automatic stay provision of the Bankruptcy Code applies to claims asserted against debtor's alter ego where state corporate law allowed debtor to recover against its own alter ego and plaintiffs failed to show that debtor abandoned claim or that automatic stay had been lifted by the bankruptcy court). Without briefing or a fuller record in this regard, I think it improper to rely so cavalierly on such a rationale. Finally, even if we could equate the defendants with the bankrupt, I cannot see how they could be said to derive any benefit, direct or indirect, from the bankruptcy trustee's collection of rents and use of the funds to pay off debts from which the bankrupt would, presumably, have been discharged in any event. This seems a sort of magic trick: the defendants are "in" the bankruptcy for purposes of benefit from the rent collection, "out" for purposes of rent "abatement".
 
 
 35
 Although inclusion of the bankruptcy period for rent "abatement" purposes was erroneous in my opinion, I do not agree with defendants that it was error for the trial court to admit evidence of conditions from that period to show the nature of conditions earlier. Ordinary assumptions of continuity permit the inference, and defendants were free to rebut it with evidence of changes in quality occurring in the course of the bankruptcy.