OPINION OF THE COURT
Chief Judge Cooke.
Under the traditional common-law principles governing the landlord-tenant relationship, a lease was regarded as a conveyance of an estate for a specified term and thus as a transfer of real property. Consequently, the duty the law imposed upon the lessor was satisfied when the legal right of possession was delivered to the lessee. The lessor impliedly warranted only the continued quiet enjoyment of the premises by the lessee. This covenant of quiet enjoyment was the only obligation imposed upon the landlord which was interdependent with the lessee’s covenant to pay rent. As long as the *323 undisturbed right to possession of the premises remained in the tenant, regardless of the condition of the premises, the duty to pay rent remained unaffected.
Because the common law of leasehold interests developed in rural, agrarian England, the right to possession of the land itself was considered the essential part of the bargain; structures upon the land were deemed incidental. Thus, notwithstanding that the building may have constituted the substantial part of the tenant’s consideration for entering into the lease, its destruction did not suspend his duty to pay the entire rent or afford him the right to rescind the lease (see 2 Powell, Real Property, par 233 et seq.). Indeed, even if the landlord had expressly covenanted to repair structures on the demised premises, that promise was considered ancillary to the tenant’s obligation to pay rent. Hence, the failure of the lessor to perform the obligations imposed by his promise to repair gave the lessee only the right to maintain an action for damages; it did not vest in him a defense to an action grounded upon nonperformance of his covenant to pay rent (1 American Law of Property [Casner ed], § 3.79).
As society slowly moved away from an agrarian economy, the needs and expectations of tenants underwent a marked change. No longer was the right of bare possession the vital part of the parties’ bargain. The urban tenant seeks shelter and the services necessarily appurtenant thereto — heat, light, water, sanitation and maintenance. Unfortunately, the early attempts of the common law to adapt to the changes encompassed by this societal transition and to mitigate the severity of the rule holding that the tenant’s covenant to pay rent was independent of all but the most basic of the landlord’s obligations proved less than satisfactory.
The harshness of the common-law rule was mitigated to a degree by decisions holding that performance of a tenant’s covenant to pay rent was excused when the premises were destroyed through no fault of his own (e.g., Graves v Berdan, 26 NY 498, 501). Subsequent judicial holdings expanded the scope of the landlord’s covenant of quiet enjoyment to include a duty to refrain from any act or omission which would render the premises unusable by the tenant (e.g., Tallman v Murphy, 120 NY 345, 351-352). Again, however, development of this theory of constructive eviction did not meet the needs of tenants in a society rapidly undergoing urbanization and, as a practical matter, was of no aid in helping them obtain essen *324 tial services. It simply afforded the tenant the option to abandon the premises and cease paying rent if the failure of services was sufficiently severe. While the constructive eviction principle mollified the rigors of the common law to some extent, it was fraught with uncertainty, for the reasonableness of the tenant’s action was subject to the vicissitudes of judicial review in an action by the landlord. If the condition of the dwelling was later determined not to have justified vacation of the premises, the tenant remained liable for unpaid rent. Further, rescission of the lease and abandonment of the premises did not spur landlords into making necessary repairs in locales in which the demand for housing greatly exceeded its supply and compelled tenants living in uninhabitable premises to undergo the expense of locating new premises and moving their belongings. Thus, since the common law imposed no implied service obligations on the landlord, maintenance and other essential services often were never performed, especially in low-income neighborhoods.
These early attempts presaged a distinct trend among courts and legislatures toward characterizing a lease of residential property as a contract containing an implied warranty of habitability interdependent with the covenant to pay rent (e.g., Pines v Perssion, 14 Wis 2d 590; Brown v Southall Realty Co., 237 A2d 834 [DC]). A number of factors mandated departure from the antiquated common-law rules governing the modern landlord-tenant relationship. The modern-day tenant, unlike his medieval counterpart, is primarily interested in shelter and shelter-related services. He is usually not competent to perform maintenance chores, even assuming ability to gain access to the necessary equipment and to areas within the exclusive control of the landlord (see Javins v First Nat. Realty Corp., 428 F2d 1071, 1077-1078, cert den 400 US 925). Since a lease is more akin to a purchase of shelter and services rather than a conveyance of an estate, the law of sales, with its implied warranty of fitness (Uniform Commercial Code, § 2-314) provides a ready analogy that is better suited than the outdated law of property to determine the respective obligations of landlord and tenant (Green v Superior Ct., 10 Cal 3d 616, 626-627).
The transformation of the nature of the housing market occasioned by rapid urbanization and population growth was further impetus for the change. Well-documented shortages of low- and middle-income housing in many of our urban centers *325 has placed landlords in a vastly superior bargaining position, leaving tenants virtually powerless to compel the performance of essential services. Because there is but a minimal threat of vacancies, the landlord has little incentive to voluntarily make repairs or ensure the performance of essential services (see Boston Housing Auth. v Hemingway, 363 Mass 184, 197-198; Javins v First Nat. Realty Corp., 428 F2d 1071, 1079-1081, supra). While it is true that many municipalities have enacted housing codes setting minimum safety and sanitation standards, historically those codes could be enforced only by municipal authorities (Davar Holdings v Cohen, 280 NY 828, but see L 1977, ch 849, § 13).
In short, until development of the warranty of habitability in residential leases, the contemporary tenant possessed few private remedies and little real power, under either the common law or modern housing codes, to compel his landlord to make necessary repairs or provide essential services. Initially by judicial decision (e.g., Tonetti v Penati, 48 AD2d 25; Jackson v Rivera, 65 Misc 2d 468; Morbeth Realty Corp. v Velez, 73 Misc 2d 996; Steinberg v Carreras, 74 Misc 2d 32) and ultimately by legislative enactment in August, 1975, the obsolete doctrine of the lease as a conveyance of land was discarded. Codifying existing case law, the enactment of section 235-b of the Real Property Law (L 1975, ch 597, as amd), placed "the tenant in parity legally with the landlord” (1975 Sen J 7766-7776 [remarks of Senator Barclay]). A residential lease is now effectively deemed a sale of shelter and services by the landlord who impliedly warrants: first, that the premises are fit for human habitation; second, that the condition of the premises is in accord with the uses reasonably intended by the parties; and, third, that the tenants are not subjected to any conditions endangering or detrimental to their life, health or safety.[1]
*326 Petitioner is the owner of Park West Village, an apartment complex comprised of seven highrise buildings on the Upper West Side of Manhattan. For a 17-day period in May, 1976, petitioner’s entire maintenance and janitorial staff did not report to work due to a strike by members of Employees’ Union Local 32-B. As a result of the strike, the tenants of Park West Village suffered extensive service interruptions which prompted some of them to withhold rent for the period encompassed by the strike.
Petitioner commenced this summary nonpayment proceeding in the Civil Court of the City of New York. Respondent raised the affirmative defense that, as a result of the strike, petitioner had not provided essential services and had allowed conditions dangerous to the health of tenants to exist on the premises, constituting a breach of its implied warranty of habitability. By stipulation, the parties agreed that the decision rendered in the instant proceeding would bind some 400 tenants of Park West Village similarly situated. The parties further stipulated that in lieu of calling witnesses, they would submit written statements describing the extent and effect of the service interruptions caused by the strike. Hence, there is presented only the legal question of whether the conditions existing at Park West Village throughout the duration of the strike constituted a breach of the implied warranty of habitability.
During the strike, the entire complement of porters and handymen at the complex — some two thirds of the entire work force — did not report to work. All of the incinerators were wired shut, compelling tenants to dispose of refuse at the curbs in paper bags supplied by the landlord. Because employees of the New York Sanitation Department refused to cross the striking employees’ picket lines, uncollected trash piled up to the height of the first floor windows. Exposure of the accumulated garbage to the elements caused it to fester and exude noxious odors, eventually necessitating the declaration of health emergency at the complex by the New York City Department of Health. Regular exterminating service was not performed which, together with the accumulated garbage, created conditions in which rats, roaches and vermin flourished. Routine maintenance service was not performed, *327 common areas remained uncleaned and sporadic interruptions of other services plagued the development. Civil Court determined that the conditions at the complex constituted a breach of the implied warranty of habitability and found that the loss in rental value of the apartments sustained by the tenants justified a reduction of 10% in their June rent bill. Both the Appellate Term and the Appellate Division affirmed, the latter court granting petitioner leave to appeal to this court.
Petitioner maintains, and rightfully so, that a landlord is not a guarantor of every amenity customarily rendered in the landlord-tenant relationship. The warranty of habitability was not legislatively engrafted into residential leases for the purpose of rendering landlords absolute insurers of services which do not affect habitability. Rather section 235-b of the Real Property Law was designed to give rise to an implied promise on the part of the landlord that both the demised premises and the areas within the landlord’s control are fit for human occupation at the inception of the tenancy and that they will remain so throughout the lease term.
The scope of the warranty includes, of course, conditions caused by both latent and patent defects existing at the inception of and throughout the tenancy. However, as the statute places an unqualified obligation on the landlord to keep the premises habitable, conditions occasioned by ordinary deterioration, work stoppages by employees, acts of third parties or natural disaster are within the scope of the warranty as well (cf. Uniform Residential Landlord and Tenant Act, § 2.104). Inasmuch as the landlord is vested with the ultimate control and responsibility for the building, it is he who has a corresponding nondelegable and nonwaivable duty to maintain it. The obligation of the tenant to pay rent is dependent upon the landlord’s satisfactory maintenance of the premises in habitable condition.
Naturally, it is a patent impossibility to attempt to document every instance in which the warranty of habitability could be breached. Each case must, of course, turn on its own peculiar facts. However, the standards of habitability set forth in local housing codes will often be of help in resolution of this question. Substantial violation of a housing, building or sanitation code provides a bright-line standard capable of uniform application and, accordingly, constitutes prima facie evidence that the premises are not in habitable condition. However, a simple finding that conditions on the lease prem *328 ises are in violation of an applicable housing code does not necessarily constitute automatic breach of the warranty. In some instances, it may be that the code violation is de minimis or has no impact upon habitability. Thus, once a code violation has been shown, the parties must come forward with evidence concerning the extensiveness of the breach, the manner in which it impacted upon the health, safety or welfare of the tenants and the measures taken by- the landlord to alleviate the violation (see Javins v First Nat. Realty Co., 428 F2d 1071, 1082, supra; Jack Spring, Inc. v Little, 50 Ill 2d 351, 366; King v Moorehead, 495 SW2d 65, 76 [Mo]; cf. Mease v Fox, 200 NW2d 791, 796-797 [Iowa]).
But, while certainly a factor in the measurement of the landlord’s obligation, violation of a housing code or sanitary regulation is not the exclusive determinant of whether there has been a breach. Housing codes do not provide a complete delineation of the landlord’s obligation, but rather serve as a starting point in that determination by establishing minimal standards that all housing must meet (see Boston Housing Auth. v Hemingway, 363 Mass 184, 200-201, n 16, supra). In some localities, comprehensive housing, building or sanitation codes may not have been enacted; in others, their provisions may not address the particular condition claimed to render the premises uninhabitable. Threats to the health and safety of the tenant — not merely violations of the codes — determines the reach of the warranty of habitability.
A residential lease is essentially a sale of shelter and necessarily encompasses those services which render the premises suitable for the purpose for which they are leased. To be sure, absent an express agreement to the contrary, a landlord is not required to ensure that the premises are in perfect or even aesthetically pleasing condition; he does warrant, however, that there are no conditions that materially affect the health and safety of tenants. For example, no one will dispute that health and safety are adversely affected by insect or rodent infestation, insufficient heat and plumbing facilities, significantly dangerous electrical outlets or wiring, inadequate sanitation facilities or similar services which constitute the essence of the modern dwelling unit. If, in the eyes of a reasonable person, defects in the dwelling deprive the tenant of those essential functions which a residence is expected to provide, a breach of the implied warrant of habitability has occurred.
*329 Under the facts presented here, respondents have proven that petitioner breached its implied warranty of habitability. As a result of the strike, essential services bearing directly on the health and safety of the tenants were curtailed, if not eliminated. Not only were there numerous violations of housing and sanitation codes (e.g., Administrative Code of City of New York, §§ D26-11.01, D26-11.03, D26-11.05, D26-13.03, D2614.03, D26-22.03), but conditions of the premises were serious enough to necessitate the declaration of a health emergency. In light of these factors, it ill behooves petitioner to maintain that the tenants suffered only a trifling inconvenience. Rather, the failure of petitioner to provide adequate sanitation removal, janitorial and maintenance services materially impacted upon the health and safety of the tenants and permitted them an abatement in their contracted-for rent.[2]
Problematical in these cases is the method of ascertaining damages occasioned by the landlord’s breach. That damages are not susceptible to precise determination does not insulate the landlord from liability (Green v Superior Ct., 10 Cal 3d 616, 638-639, supra; see Matter of Rothko, 43 NY2d 305, 322-323; Wakeman v Wheeler & Wilson Mfg. Co., 101 NY 205, 209). Inasmuch as the duty of the tenant to pay rent is coextensive with the landlord’s duty to maintain the premises in habitable condition, the proper measure of damages for breach of the warranty is the difference between the fair market value of the premises if they had been as warranted, as measured by the rent reserved under the lease, and the value of the premises during the period of the breach. The award may take the form of a sum of money awarded the tenant in a plenary action or a percentage reduction of the contracted-for rent as a setoff in summary nonpayment proceeding in which the tenant counterclaims or pleads as a defense breach by the landlord of his duty to maintain the premises in habitable condition. We do not comment upon the availability of other remedies not implicated under the facts presented here.
In ascertaining damages, the finder of fact must weigh the severity of the violation and duration of the conditions giving rise to the breach as well as the effectiveness of steps taken by the landlord to abate those conditions. Since both sides will *330 ordinarily be intimately familiar with the conditions of the premises both before and after the breach, they are competent to give their opinion as to the diminution in value occasioned by the breach (Teerpenning v Corn Exch. Ins. Co., 43 NY 279, 282; Richardson, Evidence [10th ed], § 364, subd n). Indeed, the Legislature has instructed that in ascertaining the diminished market value of these dwellings, expert testimony is not required (Real Property Law, § 235-b, subd 3).
The record here amply supports the 10% reduction in rent ordered by Civil Court. Given the severity of the conditions existing on the premises during the strike and the feeble attempts by petitioner to alleviate the dangers to the health and safety of the tenants, there is no basis for disturbing the award.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur with Chief Judge Cooke.
Order affirmed.

. The statute provides:
"1. In every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant and warrant that the premises so leased or rented and all areas used in connection therewith in common with other tenants or residents are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety. When any such condition has been caused by the misconduct of the tenant or lessee or persons under his direction or control, it shall not constitute a breach of such covenants and warranties.
"2. Any agreement by a lessee or tenant of a dwelling waiving or modifying his rights as set forth in this section shall be void as contrary to public policy.
*326 "3. In determining the amount of damages sustained by a tenant as a result of a breach of the warranty set forth in this section, the court need not require any expert testimony.”

. It is noted that the statute we construe today speaks only of residential property used for such a purpose.