OPINION OF THE COURT
John A. Milano, J.
The significant issues raised herein as they relate to a garden apartment complex are apparently ones of first impression.
ISSUES
Is there a breach of the warranty of habitability where there exists conditions in the common environmental areas of a garden apartment complex that are detrimental to tenants’ life, health or safety, or frustrate the uses for which tenants reasonably intended to make of their premises?
Is the subject garden apartment complex a de facto multiple dwelling and the landlords’ failure to register the premises as a multiple dwelling, a bar to the recovery of rent?
*430 STATEMENT OF FACTS
Forest Hills No. 1 Co. is the owner of record of 70 middle-class garden apartments and Gale Realty Company is the owner of record of 120 garden apartments located in Forest Hills, Queens. The 190 garden apartments owned by the said landlords comprise one large development in the vicinity of 108th Street to 110th Street, between 63rd Road and 64th Road, and is known in the aggregate as Forest Hills Park Gardens. The Park Gardens garden apartments were erected on or about 1948-1949 as a group of 95 two-story attached units (a unit as used herein comprised of two apartments with separate interior doors, one apartment located on the ground floor and the other on the second floor). In the front of each unit, prior to construction, there were patches of lawn with various shrubs. Eight boilers supply heat for the 190 apartments. Gale has 5 boilers supplying heat to its 120 apartments and Forest Hills, 3 boilers supplying heat to its 70 apartments. There are also 8 separate sewer and water lines servicing the 190 apartments, and gas is supplied by means of 8 gas lines. Electricity is supplied to the entire Park Gardens by Con Edison by means of separate electrical lines leading to each apartment. The entire 190-apartment development was operated, managed and treated in all respects as one development, albeit two different record owners. The premises are subject to the Rent Stabilization Law notwithstanding that certificates of occupancy were issued for portions thereof as one- or two-family dwellings (Administrative Code of City of New York, § YY51-3.1, added Sept. 25, 1969). The tenant Schimmel took occupancy in 1953, about 26 years ago, prior to landlord’s ownership of the Park Garden and after full completion of the Park Garden complex. At that time, Schimmel was attracted to the subject garden apartment by its countrified atmosphere, which included lawns, playgrounds, sandboxes, swings, slides, shrubs and a quiet environment. Schimmel had a two-year-old child who used the various recreational facilities and played on the lawn and backyard areas. At the time Schimmel rented his apartment he was given a tour of the development and introduced to the various facilities and the countrified qualities of the garden apartments by *431 the predecessor landlord and was told that the garden apartment, especially with the use of the backyards, was “like having one’s own home”. Schimmel rented his garden apartment after this tour of the Park Garden complex and after these representations by the said predecessor landlord. On April 15, 1977, Schimmel renewed his tenancy by signing a lease agreement where landlord continued to represent that the common areas, that formed a part of the countrified atmosphere of a garden apartment complex would be maintained in a fashion that would be fit for tenants’ use, be habitable and not be subject to conditions that would be dangerous, hazardous or detrimental to the life, health or safety of the tenant, and these provisions and covenants were contained in his lease. Sevos took occupancy on or about February 15,1979. She moved in pursuant to a lease agreement. Prior to leasing the subject garden apartment Sevos had resided in suburban River-dale, in a three-family house fronted with lawns. Before leasing the subject apartment, she had reviewed several apartments. She rejected a brownstone in Brooklyn where the front lawn was too small. She had also visited some garden apartments in Queens owned by Carol Management. At the time Sevos rented the subject apartment, she was given a tour of the Park Garden development by the superintendent Tony Gonzalez. She was shown the nice shrubbery, trees, sidewalks, metal fences enclosing the lawns fronting the various garden apartment units and clotheslines, and was advised that the neighborhood was quiet and that regular “block” parties occurred. On the basis of this tour Sevos leased the subject garden apartment. Indeed Robert Handler of Elmore Management, the agent responsible for the rentals admitted that a tenant has “got to be blind not to see the surroundings”. In paragraph 12 of Sevos’ lease, landlord again warranted as in the Schimmel agreement, that the public common areas would be fit for the uses intended by the tenant and would be habitable and free from conditions that would be inimical to tenant’s life, health or safety.
On or about the latter part of July and the first part of August, 1978, landlords commenced construction to convert the 190 garden apartments (or 95 units) to one- and *432 two-family homes. Work was commenced even though landlords had not obtained an order from the conciliation and appeals board permitting their withdrawal of the garden apartments from the rental market. In fact, at this time no application had even been filed. The construction and conversion work included the following: the removal of all windows, except steel casement windows; the excavation of all basements to create new and full basements; the installation of new gas-fed hot water heating units in each unit; a revamp of the entire electric system; the installation of new sewer lines, involving substantial excavation as these new lines were installed below ground; demolition of garages; the remodeling of kitchens; remodeling of bathrooms. Although the contractors and workmen used some manual tools, it was admitted that in many instances pneumatic drills (e.g., installing the electric lines) backhoes, trucks and conveyor belts were utilized. The work commenced as early as 7:00 a.m. and normally ended at 5:00 p.m. from Monday to Friday. Work was also done on certain Saturdays commencing at 7:00 a.m. In summary, after construction commenced, the said landscape at the development, in many areas, appeared ravished covered with mounds of dirt and debris, and holes. In one situation, an area was deemed hazardous by the Department of Buildings which issued an order to terminate activities and shore and brace the area that had the cave-in. The mountains of dirt were as high as 13 feet in many areas and averaged 10 feet. The lawns and grass were dug up. Toilet bowls, bathtubs, wooden cartons, concrete sewer pipe, glass, window panes, tree limbs, dislocated shrubbery, broken fences, broken garbage cans and heavy machinery covered the lawns and playground areas in the entire development, especially in Schimmel’s backyard and Sevos’ front lawn. The holes were, on the average, approximately 3Vz feet wide by 5 feet deep. The existence of these conditions was depicted in the numerous photographs that were submitted as evidence. These conditions were also confirmed by the testimony of several witnesses. The existence of these conditions and the constant construction work seriously and negatively impacted on tenants’ habitability and frustrated the uses for which tenants *433 reasonably intended to make of the premises when they initially leased the garden apartments.
THE LAW
The court first addresses itself to the question whether the subject garden apartment complex is in reality a multiple dwelling and if so, whether the landlords’ failure to register the premises constitutes a bar to the recovery of rent. (Multiple Dwelling Law, § 325, subd 2; Administrative Code, § D26-41.21, subd b.) Indeed, a garden apartment complex erected under plans filed after April 18, 1954, is expressly included as a multiple dwelling. (Multiple Dwelling Law, §4, subd 8; Administrative Code, § D26-1.07.) And to complicate the matter further, the said premises are subject to the Rent Stabilization Law, which law normally applies to a class A multiple dwelling, containing six or more units and in which a garden apartment complex is specifically included when it has “common facilities such as sewer line, water main, and heating plan, and operated as a unit under a single ownership on May sixth, nineteen hundred sixty-nine notwithstanding that certificates of occupancy were issued for portions thereof as one- or two-family dwellings”, as in the case here. (Administrative Code, § YY51-3.1 [added Sept. 25, 1969].) It would appear that the purpose of section YY51-3.1 was to include multiple family garden-type maisonette dwelling complexes in the rent stabilization structure so that tenants therein would obtain the benefits of controlled rents, and in addition lease renewals, services and maintenance and protection against arbitrary evictions. (Administrative Code, § YY51-4.0.)
A careful reading of section 4 (subds 7, 8, pars a, b, and art 5-A) of the Multiple Dwelling Law together leads this court to conclude and to hold that although the garden complex premises herein are subject to rent stabilization because this particular garden-type maisonette dwelling project was constructed and built prior to April 18, 1954 and certificates of occupancy issued for portions thereof as one- or two-family dwellings, it cannot be considered a de facto multiple dwelling subject to subdivision 2 of section 325 of the Multiple Dwelling Law which states that in the City of New York where local law requires the registration *434 of owners of multiple dwellings and which precribes penalties, remedies and sanctions to be imposed for the violation of such local registration requirements, no rent shall be recovered by the owner, who fails to comply with such registration requirements. (Administrative Code, art 41, §§D26-41.01, D26-41.21.) Since the court has concluded that there is no bar under subdivision 2 of section 325 of the Multiple Dwelling Law, the prima facie case of the landlord by stipulation has been established. The tenant Schimmel’s rental obligation through June 30, 1979 is $2,247 and Sevos’ obligation for the said period is $1,780.66. The court now turns its attention to whether under the law the tenants are entitled to an offset or abatement on their counterclaims and if so, to what monetary extent?
The court concludes that there existed conditions in the common environmental areas of this garden apartment complex which were detrimental to the tenants’ life, health or safety and which frustrated the uses for which the tenants reasonably intended to make of their premises and these conditions constitute a breach of the implied warranty of habitability. (Real Property Law, § 235-b.) Implied in every residential rental agreement is the proposition that a tenant’s obligation to pay rent is coextensive and dependent upon the maintenance of the premises in habitable condition and suitable for the uses reasonably intended. This doctrine rests upon the sound notion and the social reality that in modern urban society, a tenant, in exchange for rent, expects not only space but also a body of goods and services which together renders the premises habitable and fit for reasonably intended uses. (Park West Mgt. Corp. v Mitchell, 47 NY2d 316; 57 E. 54th Realty Corp. v Gay Nineties Realty Corp., 71 Misc 2d 353.)
In the case at bar, landlords leased to the tenants not only individual apartments but the common environmental areas surrounding the garden apartment structures and which are a part of the garden apartment complex; or these common areas are appurtenances or easements or part of the leasehold under rent stabilization implied into the lease agreements. Notwithstanding, even if the lease agreements do not expressly or impliedly include the com *435 mon environmental areas, section 235-b of the Real Property Law brings such areas under its coverage. Though there are no cases interpreting this provision of the statute, courts of this State have held that public areas outside of the specific leased apartment are covered by the warranty. (See Ocean Rock Assoc. v Cruz, 66 AD2d 878; Broadwall Investing Corp. v Zelman, NYLJ, March 27, 1978, p 14, col 1.; Committee for Preservation of Fresh Meadows v Fresh Meadows Assoc., 71 AD2d 664.) With regards to garden apartment complexes and the common environmental areas, there is no case law presently specifically applying the warranty to these areas. However, similar statutes legislating the implied warranty of habitability in other jurisdictions have held that the warranty applies to the common areas in garden-type apartments. (See Millbridge Apts. v Linden, 151 NJ Super 168, court held that a breach of warranty of habitability occurs when a tenant in a garden apartment is subjected to repeated loud noises emanating from outside of his garden apartment; King v Moorehead, 495 SW2d 65 [Mo], court held that the warranty is violated when the condition affects common areas which tenant uses.) And see Mantica R Corp. NV v Malone (106 Misc 2d 953) where the court held that the warranty may be applicable to a situation involving demolition and construction on land adjacent to a multiple dwelling. In that case the areas where construction was held were not part of the areas rented by tenants. Nevertheless the court held that the construction noise arising out of landlord’s activity at the premises constituted a breach of the warranty. And see subdivision 28 of section D26-1.07 of the Administrative Code, where premises are construed and interpreted to mean land and improvements or appurtenances or any part thereof. And in that regard, the Code of the Real Estate Industry Stabilization Association of New York City, Inc., which this garden apartment complex is subject to, has always held that outside areas, including playgrounds and parks, where the same were provided on the base date of May 31, 1968, are part of the demised premises to be serviced. (See Rent Stabilization Code, §2, subds [f], [m]; §62, subd [A]; Matter of Saxony Assoc., NYLJ, Nov. 9, 1977, p 11, col 4.)
*436 Although under Park West Mgt. Corp. v Mitchell (supra), violations by themselves are not necessarily a breach of the warranty, although a prima facie indication of the same, it cannot seriously be argued here that the impact of the conditions in the case at bar upon tenants’ habitability is de minimus. They do not merely involve aesthetic or cosmetic matters having no serious negative impact on the tenants’ habitability. And, where the uses which the tenants reasonably intend to make of the premises at the time they rented the same are frustrated, the warranty has been breached entitling tenants to damages. (Real Property Law, § 235-b; Park West, supra, pp 316-317.) Now, as for the damages.
It is now well-settled law that a landlord is not insulated from liability when it breaches the warranty simply because damages are not susceptible to precise determination. (Park West, supra; Goldner v Doknovitch, 88 Misc 2d 88.) Tenants’ damages may be measured by the reduction in rental value of their apartments (the difference between the rent reserved under the lease and the value of the premises during the period of the breach) or by actual monetary damages suffered by them or some other combination of elements. (Goldner v Doknovitch, supra; Park West, 47 NY2d 316, supra.) Tenants may testify as to the diminished value of their apartment without the necessity of expert witnesses. (Park West, supra; Real Property Law, § 235-b, subd 3.) The record amply supports tenants’ claims for damages. And in computing these damages the court carefully considered, among other things, the testimony of the said tenants as to the diminished value of their premises for the period July, 1978 to June, 1979 or 12 months. The monthly rental for Schimmel was approximately $225 and for Sevos $235. Multiplying by 12 gave the court the denominator or gross rental for the period. The numerator is the gross amount of the reduction of rent over the said period and that enabled the court to compute the gross loss or reduction percentage. The witnesses also testified in regard to the breakdown of the amount of the reduction or diminution in a dollar amount for outside (environmental) and inside (apartment premises). In this fashion the court computed the loss ratio, percentage-wise *437 for both the environmental and the apartment premises. Applying the percentages to the gross reduction for both tenants enabled the court to compute a mean percentage loss for all aspects, which represented the average over the period in question. The court determined that in applying the above formula, the loss ratio was approximately 48% and the environmental factor approximately 40% and the apartment premises 60% for the period in question. If this court were then to apply a 48% loss ratio then the damages would be assessed at 28.8% of the total gross rental for the apartment premises and 19.2% for environmental.
However, the court, after considering all of the evidence submitted, concludes that a loss ratio of 24% more closely equates the tenants’ actual deprivation broken down at 14.4% for apartment and 9.6% for environmental and in addition the sum of $120 for the tenant Schimmel for extermination expenses. As to Schimmel, the damages are computed to be $648 plus $120 (extermination services) or $768. Deducting said amount from the conceded rent owing of $2,247 leaves a balance of $1,479. As to Sevos, the damage amount is $676.80 which subtracted from the gross rental liability of $1,780.66 leaves a balance of $1,103.86.
This court determines these damages and the liability upon which same is predicated on the breach of the warranty, the breach of the tenants’ leases and the breach of the stabilization laws due to the failure of the landlord to have obtained approval of the conversion activities at the site before or during said conversion. As of the date of this decision, the court believes that no approval as yet has been forthcoming from the conciliation and appeals board.
Accordingly, final judgment for the landlord in the sum of $1,479 (tenant Schimmel) and final judgment for the landlord in the sum of $1,103.86 (tenant Sevos) for the period through June, 1979. Issuance of the warrants stayed to January 31, 1981, without costs. Legal fees waived for both sides.