OPINION OF THE COURT
Louis B. York, J.
I. BRIEF HISTORICAL BACKGROUND
In the fall of 1987, approximately 80 tenants of this 300-unit luxury building on the upper east side of Manhattan, the recipient of awards for architectural design, joined in a rent *644 strike in protest against what they viewed as deteriorating conditions and services. Summary proceedings against about 70 individual tenants were commenced. Ultimately, an order was issued by the Administrative Judge of this court requiring that all of these matters be tried jointly. Sixty-three of those original matters were tried to completion. Some matters were never joined with this joint proceeding, others were settled, some discontinued and a few resulted in default judgments against the tenants. Two were never tried and are dismissed.
The trials commenced on December 6, 1988 and concluded more than 21 months later on August 14, 1990. Frequently marred by delay and acrimony and resulting in approximately 12,000 pages of trial transcript, and some 500 exhibits, these proceedings are clearly one of the longest continuing "summary” proceedings in the history of the New York City Housing Court.
II. CLAIMS FOR RELIEF
The trial was limited generally to the rent owed for the period between October 1987 and May 1988, the period sued for by the petitioner, who during the trial rejected the court’s invitation to amend his petition to include the rent allegedly due at the time of trial.* The rents ranged from $1,064.89 for a fourth floor studio apartment to $5,379.92 for a two-bedroom apartment on the 44th floor of this rent-stabilized building.
The defenses now before the court consist of breach of the implied warranty of habitability also asserted as a counterclaim, and failure of consideration. The tenants also counterclaim for treble damages for rent overcharges, punitive damages and also seek awards for attorneys’ fees and sanctions.
At the beginning of each of the individual proceedings, the tenant consented to the petitioner’s prima facie case, but not as to the precise amount in dispute. Thereafter, each of the tenants testified to their defenses and counterclaims. After all the respondents had completed the presentation of each of their defenses, the petitioner presented his rebuttal.
III. BROCHURE AND FLOOR PLAN
At the beginning of the trial a brochure containing a floor plan and statements about the services and other features was submitted in evidence by the petitioner. Shown to prospective *645 tenants before they signed the lease, the written portion stated:
"Panoramic views of New York City, its rivers and bridges; Long Island Sound and the Palisades.
"Solar glass thermopane picture windows.
"Private membership, roof top, year-round Pool Club.
"24 hour attended lobby.
"Video monitored service and garage entrances.
"Four pipe central air conditioning system providing a choice of cooling and/or heating during transitional seasons.
"Air conditioned lobby and corridors.
"Kitchens:
"Ceramic tile floors
"Formica counter tops and cabinet areas
"G.E. 4-cycle dishwasher
"G.E. 2-door frost-free refrigerator with Automatic Icemaker
"Tappan range with 2 continuous cleaning ovens, digital clock and automatic timer
"Charcoal filtered range hood
"Stainless steel sink
"Bathrooms with Dupont 'Corian’ molded sinks and counter tops; quarry tile floors
"Oak parquet floors
"Sprinkler and smoke alarm systems in all public corridors
"Smoke alarm in each apartment
"46th floor laundry room with spectacular city views
"Master T.V. antenna system; Cable T.V. available
"4 high speed Otis elevators equipped with intercom phone
"Direct Access to attended underground garage”.
Paragraph 29 of each lease absolved the landlord of responsibility for the condition of the premises or reliance by the tenant for any promises made by landlord prior to the signing of the lease "unless what was said or promised was * * * found in owner’s floor plan or brochure shown to you before you signed the lease.”
IV. THE PERIOD OF TIME LITIGATED
-The testimony of each of the tenants about the conditions of the building or lack of services was limited by agreement to their period in occupancy during the period from May 1, 1982 *646 to May 31, 1988, that being the period comprehending the Statute of Limitations for such claims.
V. CONDITIONS IN THE PUBLIC AREAS
A. Findings
Approximately 60 tenants testified. I was impressed by their near unanimity on many items concerning the public areas, and find their testimony to be credible. They testified in overwhelming numbers about an elevator system that made them wait interminable lengths of time for elevators, particularly during the morning and evening rush hours. The result was frequent lateness to work and other appointments and using the stairs to and from their apartments. During the period, tenants suffered consistently from elevators that skipped floors and opened on the wrong floors. The petitioner produced no one with day-to-day hands-on experience with the elevators. The testimony of expert witnesses about elevator performance was insufficient to controvert the personal experiences of the tenants. These witnesses had no personal knowledge of the day-to-day observations of the tenants. Their testimony taken from data furnished to them by others from which they constructed complicated statistical compilations were of dubious worth and were one instance of many examples of trying to impeach the tenants’ firsthand experience by what amounted to an avalanche of secondary evidence which came in under various exceptions to the hearsay rule.
A host of tenants complained about the stench emanating from garbage stored between the package room and the garage. Tenants spotted mice in that area. The door separating the garage from the building was always unlocked, creating a security problem. Fixtures were removed in the public areas, leaving exposed wiring for extended periods of time. In February and March of 1988, there were two floods at the front entrance which turned egress and entry into the negotiation of an obstacle course. In October 1988 water cascaded down the front of the building, barring entrance and seeping into the mailboxes and their contents. The package room service began deteriorating in 1985 and 1986 and remained at a low level thereafter resulting in delivery delays of 1 to 2 weeks.
The air conditioning in the lobby was frequently inoperative. The lobby carpets were left dirty on many occasions. The hallway fire alarms did not function on several occasions. The laundry room on the 46th floor was dirty and suffered from overflowing sinks.
*647 The testimony of C. Scott Smith who, as residential property manager from January 4, 1988 through October 11, 1988, was responsible for the day-to-day and long-term operations of the building, substantially confirmed the tenants’ testimony about the conditions described in the public areas by the tenants.
On the second day of his employment, he conducted a roof to basement inspection of the property. He started on the 46th floor and made his way downward. His testimony regarding elevator operations is noteworthy because it is at odds with the testimony of the petitioner’s witnesses. He observed numerous occasions where one or more elevators were out of service. Although there were four cars serving the building, one is a service car used primarily by building staif. When one of the regular cars was out, only two were left to service a 301-apartment 46-story building. It does not take much imagination to envision the delay and confusion that such a condition can cause, especially during the time when tenants were going to and from work. This description together with that of the tenants is adopted by the court because of the great weight accorded to the day-to-day observations of the tenants and this witness. Smith’s inspection also revealed a collapsing ceiling in the 46th floor laundry room, missing sections of acoustical tile, an overflowed sink and roach infestation. The tiles were not replaced during the period but another sink was connected to one half of the washing machines in late winter or early spring of 1988 and this stemmed the overflow. He observed 60 to 70 bags of garbage piled inside the main entrance inside the building. The compactor room on the ground floor had garbage all over the floor and was heavily infested with mice and roaches. Standing in front of the valet station, a mouse ran across his foot. The electronically operated security door at the valet station had an inoperative lock, thereby allowing anyone to walk into the building. The boiler room in the subbasement had 4 to 5 inches of standing water.
There were no signup sheets for tenants to request an exterminator. To get extermination services they had to leave a note with the concierge. When Smith first came on the job, the exterminator did not come to the building on a regular basis.
During the entire period that Smith was employed, the air conditioners for the public area never functioned. He observed that the chilled water cooling coil which provides conditioned air from the outside was cracked in about 20 places. There *648 was no air conditioning in the public areas to the end of the period being litigated — May 31, 1988.
The air conditioner that serviced the individual apartments leaked. The galvanized pipes which provided the run-off of drainage were placed at an angle that prevented them from carrying the water into the building’s drainage system and ultimately into the city sewer system. Apartments where such leaking occurred were observed to have buckling floors at the same time. Approximately, between 10,000 and 11,000 square feet of parquet floors were replaced between January 1, 1988 and May 31, 1988.
There were soiled carpets in the public hallways, trash in the rear stairwells, unemptied ashtrays, graffiti on some walls caused by a lack of cleaning supplies and a lack of cleaning equipment (one operable vacuum cleaner for the entire building!) and mismanagement of manpower. Smith concluded that there was not enough staff to manage the building.
The caulking between the glass curtain wall that surrounds the building was nonexistent in many places. This allowed water leakage into apartments.
The record is replete with Smith’s conversations with petitioner Solow himself, with Jack Scaldini, executive vice-president of petitioner’s company managing the building, and Rosalie Wolfe, vice-president of the company, during which he repeatedly advised them of these conditions.
B. Conclusions of Law
Section 235-b of the Real Property Law creating an implied warranty of habitability in residential housing is the starting point in the evaluation of the tenants’ main defense and counterclaim: "In every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant and warrant that the premises so leased or rented and all areas used in connection therewith in common with other tenants or residents are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety.”
The seminal decision on the warranty was written by then Chief Judge Cooke in Park W. Mgt. Corp. v Mitchell (47 NY2d 316 [1979]). There he wrote on behalf of the court that a breach of the warranty occurs where there are conditions which are a threat to the health and safety of the tenants. *649 Illustrations of such a breach, he stated, were the existence of insect and rodent infestation, insufficient heat and plumbing facilities, significantly dangerous electrical outlets, inadequate sanitation facilities or similar lack of services which impact directly on health and safety. Certainly, the accumulation of garbage and its attendant stench, the threat to security from the unlocked garage doors and the door operated by the valet station, the infestation of mice and roaches on the first floor, the collapsing ceiling and overflowed sink in the 46th floor laundry room, the standing 4 to 5 inches of water in the boiler room and elevators that were delayed for significant periods of time for tenants who live 10 flights or more above the ground floor were a significant threat to the health and safety of the tenants. So was exposed wiring from removed electrical fixtures, and the malfunctioning fire alarms, despite the statement in the brochure that there were "[s]prinkler and smoke alarm systems in all public corridors”.
Although each case must turn on its own individual facts, one criterion to evaluate whether there has been a breach of the implied warranty’s guarantee of freedom from conditions detrimental to life, health or safety is examination of the various housing codes. (Multiple Dwelling Law, Public Health Law, New York City Housing Maintenance Code, i.e., Administrative Code of City of New York § 27-2001 et seq.) These codes while a starting point, however, are not exclusive determinants of actual threats to life, health or safety. "Threats to the health and safety of the tenant — not merely violations of the codes — determines the reach of the warranty of habitability.” (Park W. Mgt. Corp. v Mitchell, supra, 47 NY2d, at 328.) "No one will dispute that health and safety are adversely affected by insect or rodent infestation, insufficient heat and plumbing facilities, significantly dangerous electrical outlets or wiring, inadequate sanitation facilities or similar services which constitute the essence of the modern dwelling unit.” (Concord Vil. Mgt. Co. v Rubin, 101 Misc 2d 625, 627 [Dist Ct, Suffolk County 1979].)
This criterion establishes that the conditions in the public areas established the failure of the landlord to maintain the premises free of conditions threatening to the lives, safety and welfare of the tenants, thereby breaching the warranty. (Park W. Mgt. Corp. v Mitchell, supra; Octagon Assocs. v Kaufman/ Spivak Assocs., NYLJ, July 14, 1989, at 26, col 4 [App Term, 1st Dept]; Tower W. Assocs. v Derevnuk, 114 Misc 2d 158 [Civ *650 Ct, NY County 1982].) This does not, however, exhaust the full impact of the implied warranty.
Besides construing the existence of dangerous conditions, Real Property Law § 235-b states that the premises are fit for the uses reasonably intended by the parties. (Park W. Mgt. Corp. v Mitchell, supra, 47 NY2d, at 325.)
In determining whether the warranty of fitness contained in UCC 2-315 has been breached, this jurisdiction has adopted the "reasonable expectation” test, which means that there is a breach of the warranty where the consumer is injured by conditions which he could not have reasonably anticipated to be present in the product purchased. The person with whom he contracts has, therefore, the duty to remove such conditions. (Stark v Chock Full O’Nuts, 77 Misc 2d 553 [App Term, 1st Dept 1974].) By adopting the phraseology "the uses reasonably intended by the parties”, the legislators manifested their desire that the warranty of habitability in residential tenancies paralleled the warranty of fitness in commercial transactions under UCC 2-315. This means that the premises are to be maintained in accordance with the reasonable expectations of the tenant.
While no appellate court has ruled on this doctrine, the trial courts have embraced it. (Mantica R Corp. NV v Malone, 106 Misc 2d 953 [Civ Ct, NY County 1981]; see also, Tower W. Assocs. v Derevnuk, 114 Misc 2d 158, supra [Civ Ct, NY County 1982].) Certain amenities not necessarily life threatening, but consistent with the nature of the bargain — air conditioning would be an example — fall under the protection of this branch of the warranty. (Mantica R Corp. NV v Malone, supra.) Predictability and reliability of services is another factor. (Tower W. Assocs. v Derevnuk, supra; 111 E. 88th Partners v Simon, 106 Misc 2d 693 [Civ Ct, NY County 1980], mod on other grounds 127 Misc 2d 74 [App Term, 1st Dept 1985].) The location of the premises, the amenities that are touted to go with the apartment, and representations made by the landlord consistent with the lease are all factors that enter into a tenant’s reasonable expectations. (Forest Hills No. 1 Co. v Schimmel, 110 Misc 2d 429 [Civ Ct, Queens County 1981].)
In applying this branch of the warranty to this case, we start with the obvious expectations of this uniquely designed all glass enclosed building on Manhattan’s fashionable upper east side. Add to this the comparatively high rents exacted for *651 these apartments and one would have to assume that the expectations of the tenants encompassed more than the minimal amenities. While the warranty certainly entitled them to freedom from conditions threatening their life, health and safety, their higher rents justified increased expectations of a well-run impeccably clean building of consistent and reliable services. These expectations were reasonably enhanced by the brochure they received, which was also incorporated into the lease, with its promises of security, air conditioning in the public areas and panoramic views. The promises and expectations fell far short of the reality. The warranty in the public areas was breached.
viii. attorneys’ fees
The answers of the respondents and their posttrial memoranda requested attorneys’ fees. Neither the petitions nor the posttrial submission of petitioner requested attorneys’ fees.
The leases entered into in each case contained a standard clause which required that in the event of a default in the payment of rent, the tenant was responsible for the landlord’s ensuing attorneys’ fees in the collection of that rent. Section 234 of the Real Property Law creates a reciprocal obligation for the payment of attorneys’ fees should the tenant be successful in any lawsuit, including a summary proceeding. In the context of a nonpayment summary proceeding, attorneys’ fees are awarded to the "prevailing” litigant. To determine who is the prevailing party it is necessary to compare the petitioner’s claims with the defenses and counterclaims of the defendant. The prevailing party, if any, is the one who has most substantially succeeded on his/her claims. (Elkins v Cinera Realty, 61 AD2d 828 [2d Dept 1978].) Thus, a tenant who was successful in obtaining abatements on two counterclaims was awarded attorneys’ fees even though there was a partial judgment on the rent due to the petitioner. (Century Apts. v Yalkowsky, 106 Misc 2d 762 [Civ Ct, NY County 1980].) Nevertheless, in this jurisdiction rent abatements to tenants of 15% and 21% have been held to be insufficient to support an award for attorneys’ fees. The explanation is that "[s]ince the [petitioner] prevailed in part on its rent claim and the tenants prevailed in part upon their habitability counterclaims, each should bear the cost of their own attorney’s fees” (Bunny Realty v Miller, NYLJ, July 2, 1990, at 28, cols 1, 2 [App Term, 1st Dept]). Looking at the *652 instant proceeding, however, we note that there was no real battle over the amount owed to the petitioner. In each instance, the tenant consented to the petitioner’s prima facie case. The contest was over the abatement resulting from the breach of the warranty of habitability and the amount of damages resulting from overcharges of the rent. The chart at Appendix A [Appendix omitted for purposes of publication] illustrates that the percentage of landlord’s recovery on the amount sued for for each of the tenants who have survived to the end of this proceeding ranges from a high of 73% to a low of (155)%; the latter figure representing the ratio of the recovery to the amount sued for where recovery was in favor of the tenant.
This court holds that the award for attorneys’ fees shall comprehend the work performed for each of the respondents on the list in Appendix A. For nearly three years, all of these respondents have litigated this matter as a group. They established a tenant’s association to guide the litigation, and engaged in a common defense. All of these litigants participated in and contributed to the ultimate outcome. That ultimate outcome reflected in the chart totals at Appendix A shows that out of the $1,076,295.66 sued for against the entire group, the landlord is awarded only $239,691.36 or 22% of the amount he sued for. This court holds that the prevailing party is these tenants as a group, each of whom is entitled to recover his/her reasonable attorneys’ fees. The reasonable value of such attorneys’ fees for legal work for any tenant with respect to whom a decision has been rendered in this decision shall be determined at a hearing. (Kumble v Windsor Plaza Co., 128 AD2d 425 [1st Dept 1987].) The hearing will be conducted before a Judicial Hearing Officer to hear and report, to be appointed by the presiding Judge of this court, the Honorable Charles Ramos.
In deciding the question of reasonable attorneys’ fees, the court shall use the "lodestar” method, to wit, the hours reasonably spent by counsel multiplied by the reasonable hourly rate. (Zauderer v Barcellona, 130 Misc 2d 234 [Civ Ct, NY County 1985].) In determining the reasonable hourly rate the court shall consider the nature of the services rendered, the complexity and novelty of the issues, the attorney’s professional reputation and experience, the level of skill involved in handling the case, the result obtained and the going rate in the community for services of this kind performed by attorneys of comparable skills. (Newman v Silver, 553 F Supp 485, *653 496 [SD NY 1982]; see also, Kaufman v Diversified Indus., 356 F Supp 827 [SD NY 1973]; Matter of Snell, 17 AD2d 490 [3d Dept 1962].) In making such an evaluation, the court itself is an expert and may make an independent judgment of the reasonable value of an attorney’s services. (Newman v Silver, supra, 553 F Supp, at 497.) The parties are directed to arrange the details of the hearing with the Honorable Charles Ramos, presiding Judge of this court.
[Portions of opinion omitted for purposes of publication.]

See, Solow v Wellner, 142 Misc 2d 383, 384 (Civ Ct, NY County 1989).