OPINION OF THE COURT
Per Curiam.
Order entered April 15, 1991 modified by awarding tenants a 5% offset in rent for the period May 1987 through May 1988, by striking the additional rent abatements awarded to the tenants, and by remanding to Civil Court for further proceedings consistent with this decision; as modified, order affirmed, with $10 costs to petitioner-appellant.
These consolidated nonpayment proceedings, vigorously litigated since their commencement in October 1987, arise from a pervasive rent strike involving approximately 65 tenants at building premises located at 265 East 66th Street, in Manhattan. The "summary” proceedings have spawned several prior applications and appeals to this court and the Appellate Division, and were ultimately tried to completion over 15 court weeks culminating with the issuance of the Trial Judge’s written decision on March 29, 1991 (Solow v Wellner, 150 Misc 2d 642).[1] On this appeal we are concerned primarily with the propriety of the rent abatements awarded to all but one of the respondent tenants[2] for the landlord’s breach of the statutory implied warranty of habitability (Real Property Law § 235-b). The abatement awards each comprise two separate and distinct elements, i.e., a 10% "across the board” rent *740 offset based upon building-wide, common area conditions and an additional offset in amounts varying from 1% to 11% for defects within the individual tenant apartments. In each case the abatements awarded span the entire length of the individual tenancies, as limited only by the controlling six-year limitations period ending in May of 1988 — the last month for which landlord sought a recovery of rent on its petition. For reasons that follow, we modify the trial court’s rulings by (1) reducing the amount and duration of the common area abatement awards, and (2) striking all of the apartment-specific abatement awards, with a direction that certain of the individual tenant counterclaims be dismissed outright and that, with respect to the remaining tenants, the matter be remanded for such further proceedings as may be necessary to permit the trial court to recalculate the amount of the apartment-specific abatement awards in accordance with this decision.
We treat first the common area aspect of the abatement awards and note our view that a number of the building-wide tenant complaints are illusory or overstated. (For example, "exposed” wiring in hallways during periods of wallpapering and other owner repairs; garbage "accumulation” in basement despite undisputed showing that garbage was at all times moved by Department of Sanitation between 4 and 5 times per week.) Other tenant complaints, including "worn” hallway carpets and inefficient "package room” service, involve perceived decreases in amenities and conveniences which, while arguably forming the basis for an application to the Division of Housing and Community Renewal (DHCR) for a reduction of the regulated rent based upon the owner’s failure to maintain required services (Rent Stabilization Code [9 NYCRR] § 2523.4), are not within the intended scope of Real Property Law § 235-b. In concluding otherwise and finding such conditions to be habitability impairing, the trial court expressly adopted tenants’ thesis that they were entitled to heightened protection under the habitability statute by virtue of the "luxury” status of the building premises and the uniformly high rental amounts involved. As the Trial Judge put it: "[The tenants’] higher rents justified increased expectations of a well-run impeccably clean building of consistent and reliable services.” (Solow v Wellner, supra, at 651.) We reject the approach adopted by the trial court as incompatible with the fundamental purposes of Real Property Law § 235-b, to protect residential occupants from conditions "dangerous, hazardous or detrimental to * * * life, health [and] safety” (Real Prop *741 erty Law § 235-b [1]) and to afford a remedy for deprivations in those "essential functions” which a "reasonable person” would expect a residence to provide (Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 328). Regardless of the subjective "expectations” of any or all of the respondent tenants, expectations which were not reflected in any written agreement,[3] it is unreasonable to cast the landlord in damages for, in essence, failing to provide premises "in perfect or even aesthetically pleasing condition” (Park W. Mgt. Corp. v Mitchell, supra, at 328).
Viewed from the proper legal perspective, only one of the tenants’ building-wide complaints — that relating to elevator service — warrants a rent abatement under the statutory warranty of habitability. The voluminous trial record can support a finding that a significant decrease in the required elevator service in the high-rise apartment building did occur in or about May 1987. In this regard the tenants testified consistently and credibly that by no later than that date the elevator service, while operational, had become slow and unreliable, with at times prolonged and unexplained delays, and the "skipping” of floors. These conditions may reasonably be viewed by a fact finder as having materially affected the habitability of the building premises and, to our view, justify a 5% rent abatement for the relevant period commencing May 1987.
With respect to conditions within the tenants’ individual apartments and the additional abatements relating thereto, we find that approximately one third of the tenants still active in the litigation — those specified in footnote 4 below — have failed to establish a breach of the warranty of habitability. As occurred in connection with the public area conditions, the tenants advanced and the court applied an unreasonably exacting standard in measuring the adequacy of the landlord’s maintenance of the individual apartments. Thus, among the conditions which the court (erroneously) determined to be habitability impairing were discolored floor tiles, defective *742 cabinets and window blinds, and missing bathroom soap trays and interior doorknobs. In other instances the tenant complaints, while involving more substantial defects, were not effectively communicated to the landlord or its maintenance staff or, to the extent appropriate notice was given, the landlord reasonably addressed the complaints and timely remedied the conditions.
To illustrate these points a brief discussion of a few representative cases is necessary. We begin with tenant Cantone, who was awarded a 6% individual rent abatement covering the period between June 1987 — when tenant took occupancy— through May 1988 — the outside recovery date agreed upon by the parties in connection with tenants’ habitability counterclaims. The most substantial of the tenant’s allegations involved the "buckling” of portions of his bedroom floor due to water seepage in January or February 1988. By tenant’s own account, however, the landlord remedied the "buckling” condition by replacing the floor tiles within 3 or 4 days. Such effective remedial action on the part of the landlord renders inappropriate a rent offset of any duration, much less the one-year offset granted by the court. Nor is the brief and isolated "buckling” condition made actionable under the habitability statute on the independent basis that damage may have been caused to tenant’s carpet or other belongings (see, Curry v New York City Hous. Auth., 77 AD2d 534; 40 Eastco v Fischman, 155 AD2d 231). A similar fact pattern is presented in the proceeding involving tenant Galloway, who was awarded a 2% rent abatement for the entire period between June 1984 and May 1988. The court in its decision pointed to a single "safety” impairing defect inside the tenant’s apartment, a floor "buckling” condition in or about September 1987. The condition again was isolated and transitory, having been fully repaired by landlord within two weeks as the court itself found. Tenant Galloway also testified that there was peeling paint in his bathroom in January 1988. While aptly describing that condition as posing no "threat to safety”, the court improperly determined that the condition constituted an "inconvenience falling short of the tenant’s reasonable expectations in a building of this quality” — once more expressly invoking the disfavored "luxury” standard discussed earlier.
Respondent Risman, a tenant in the building from May 1986 through April 1988, was awarded a two-year, 4% individual abatement based upon several conditions within his apartment. These included a "constant drip” which "hit upon” the *743 tenant’s bedroom windowsill for a period of between 1 and 2Vz weeks during the fall of 1986, disturbing his sleep and "limiting) the use of the entire windowsill”; the presence of one or more roaches on 30 or 40 occasions during tenant’s two-year occupancy, a condition which, so far as appears, did not prompt tenant to formally request that landlord provide exterminator services; insufficient hot water 3 or 4 times during the tenancy; and a "nonstandard” bathroom door which "swung into the bedroom as opposed into [sic] the bathroom”. Tenant Risman significantly and accurately described at least some of those conditions as being "relatively minor” in an (undated) letter he wrote to landlord in or about March of 1987, and made the following telling statement on direct examination at trial: "we weren’t lacking heat and we did have running water, and if I was living in a four or five hundred dollar apartment, I would consider that I did have those services that kept life going. For what I expected and for what I pay, I * * * do not feel I was receiving the value for what I have been paying.”
Finally, we note the case of respondent Berger, who received a 1% offset for the entire period of her tenancy despite admitting at trial that her participation in the rent strike was based on an unrelated property damage claim against the landlord and that she was "basically satisfied with [her] apartment and the services”.
The proceedings involving the other tenants listed in footnote 4, while obviously not identical to the highlighted cases, offer but variations on a theme: housing problems either minor in nature or properly attended to by landlord. With respect to those tenant complaints no abatement award is warranted.
As concerns the remaining tenants — the substantial majority of the respondents herein — we agree that the record supports an additional rent abatement in some amount based on such common apartment-specific complaints as substantial and recurrent water leakage and severe roach infestation. The problem with the individual apartment-specific awards fashioned below is found in the court’s method of calculation which was flawed in several respects. First, meaningful appellate review of the individual awards is hindered by the court’s failure to specify the relative weight given to any particular condition or defect in its assessment of damages. Nor can we appreciate the fine calculus utilized by the court in fixing the amount of the awards, measured as they were in single-digit *744 percentage gradations. Most troubling is the court’s use in each case of a "flat-rate” percentage award constant and unfluctuating in amount for the entirety of each tenant’s occupancy, awards which on their face make no allowance for the changing and episodic nature of the conditions complained of in the individual apartments. In the circumstances, a remand for further and more detailed fact finding in connection with the surviving individual habitability claims is required. On remand, specific findings are to be made in each case as to the nature of the defect(s) involved, the finite period of its existence, and the amount of the offset attributable thereto.
 On another aspect of the case, the trial court awarded some but not all of the tenants a recovery of treble damages based upon a finding of willful rent overcharges. Contrary to landlord’s argument, the Civil Court has statutory jurisdiction to entertain a counterclaim seeking recovery of a rent overcharge and power to award treble damages where, as here, the landlord fails to disprove willfulness (McKinney’s Uncons Laws of NY § 8632 [a] [1] [¶] [Emergency Tenant Protection Act § 12; L 1974, ch 576, § 4, as amended]; Wolfisch v Mailman, 182 AD2d 533; Smitten v 56 MacDougal St. Co, 167 AD2d 205). Nor was it inappropriate for the court, in determining the legal regulated rents in connection with the overcharge issue, to rely on the rental amounts specified in the certified rent roll duly filed by the landlord with DHCR, a document originally introduced into evidence by landlord on its direct case in these proceedings. Landlord may not now be heard to argue that the amount of the legal regulated rent could only have been properly determined on the basis of its annual rent registration statements (documents which do not appear in the record), there being no affirmative showing by landlord that any of the required registration statements were in fact filed with DHCR or that the registration statements, if filed, reflected rental amounts different than those set forth in the certified rent roll.
Finally, in view of the unusual procedural posture of the appeal and the required remand, we think it inappropriate on this record to finally determine the ancillary issues of attorney fees and prejudgment interest. The issue of attorney fees in particular must necessarily be revisited by the Trial Judge *745 in light of its recalculation of the total abatements to be awarded in accordance with this decision. We have considered landlord’s remaining points concerning the conduct of the trial and find them lacking in substantial merit.
Ostrau, P. J., Riccobono and Parness, JJ., concur.

. Properly recognizing that the decision below was "framed in nonappealable terms”, landlord sought and obtained an "interim order” dated April 15,1991 which embodied the trial court’s rulings "nunc pro tune” and from which the landlord’s appeal is taken. While the order of April 15, 1991 does, technically speaking, constitute an appealable paper (CPLR 5512 [a]), the interests of judicial economy nonetheless would have been better served had landlord awaited entry of final judgments before seeking appellate review of the rulings made at nisi prius.

. The only tenant who did not receive a rent abatement after trial was respondent Shafiroff, a result stemming not from the court’s rejection of that tenant’s habitability allegations but rather from the court’s stated concern that "there is no way to calculate the total amount of rent sued for by the petitioner * * * and [hence] there is no evidence to calculate * * * the abatement”. The court reserved decision on landlord’s rent claim and tenant ShafirofFs habitability counterclaim, and directed "the taking of additional testimony” to determine the aggregate amount of rent owed by tenant.

. It is true, as tenants point out, that the brochure shown to prospective tenants by the landlord was specifically incorporated into and made part of the lease agreements (cf., New York Univ. v Schurtman, NYLJ, Dec. 15, 1992, at 21, col 1 [App Term, 1st Dept]). This is of little help to tenants’ position, however, for nowhere in the general descriptions in the brochure of the services and appurtenances to be provided is any covenant made regarding the level or quality of the landlord’s maintenance or upkeep of the building.

. Tenants Auletti, Berger, Bohlen, Bradley, Cantone, Franklin, Galloway, Grossman, Hoerner, Kahn, Nolan, Pfeiffer, Risman, Ross, Talc and Tarte.