*516 OPINION OF THE COURT
Cyril K. Bedford, J.
Petitioner, Ludlow Properties, LLC, commenced this nonpayment proceeding against respondent, Peter H. Young, seeking unpaid rents for 165 Ludlow Street, apartment No. 3-C, New York, New York 10002 (premises). Respondent interposed a breach of warranty of habitability defense stemming largely from the presence of bedbugs in the premises.
The trial was held on April 22, 2004 (tape No. 67959, counter No. 2625-end; tape No. 67960, counter No. 0-276). After considering the credible evidence and testimony at trial, the court makes the following findings of fact and conclusions of law:
The parties stipulated to most of petitioner’s prima facie case. Petitioner is the owner and landlord of the premises which is a rent-stabilized apartment in a multiple dwelling, duly registered in both respects. Respondent is in possession of the premises pursuant to a written lease commencing April 1, 2003 and the monthly rent is currently $1,025. As stipulated by the parties, the sum of $6,550 is unpaid through April 30, 2004.
The premises is a studio apartment with a sleeping loft raised on the brick wall on one side of the studio room with bathroom facilities within the premises on the other. Respondent slept in the loft bed until he realized the premises was infested with bedbugs when in the end of June 2003 he saw a posting (respondent’s exhibit B-l) in the lobby of the building which read:
“attention tenants please be advised that the exterminator will be in the building on Saturday August 2nd between 9AM and 2PM for a special service for the bed bugs. Please remove all sheets and pillowcases from your beds. Place all dirty clothing in bags to have it cleaned. Pull all bookshelves and other fixtures away from the walls for better access to those areas . . . .”
Upon reading this posting, respondent realized the cause of the hundreds of bite marks he had noticed on his body since mid-June 2003 and why he was often startled awake many nights during this period — bedbugs.
Over the next few months respondent employed four methods to attempt a restful night of sleep — none of which proved effective. First, he threw out his bed and all his bedding and slept on *517 the floor after placing towels on the floor. He quickly realized this method was useless as he was still bitten hundreds of times. Next, he put plastic sheeting on the floor in the sleeping area he prepared. This method proved just as useless. In the third week of August, he bought an inflatable mattress to sleep upon. Besides the mattress requiring reinflation at least once during the night, the mattress was unacceptable as bedbugs still preyed upon his skin. Finally, since mid-September 2003, respondent has been sleeping on a metal cot with a wire mesh covering (respondent’s exhibit D). This appeared to stop the biting of the bedbugs, but, as demonstrated in the courtroom, no real comfort was possible in this less than six-foot metal cot.
For the period July 2003 through December 2003, respondent saw bedbugs on a regular basis. Respondent found bedbugs on his couch as late as December 2003. Respondent testified that he threw out a couch containing bedbug nests, an armoire, a shelf, books, drapes, towels, linens and clothes. Respondent testified that he threw out everything except family heirlooms.
Respondent related a story about his Christmas holiday in December 2003 at his family’s home in Massachusetts. He had to enter the family home through the basement, take off all his clothes and place them in a plastic bag and then seal the bag with duct tape. He then took a hot shower for a half hour and was required to wear his father’s clothes all weekend to make sure he did not bring any of the nymphs into his parents’ home.
Petitioner had notice of the bedbug infestation since June 2003, according to Mr. Cruze of the building’s management. Petitioner’s then exterminator established an attack plan to combat the bedbugs (see, respondent’s exhibit A). It was in essence:
“All sheets, quilts, comforters and pillowcases to be removed from the beds and washed using hot water and detergent. All night stands, bureaus, dressers and closets to be emptied and all furniture and stored items to be moved away from the walls. Once this criteria was met, the exterminators could begin treatment.
“The treatment entailed spraying the mattresses, box springs and bedframes with products labeled for that application to target the bedbugs. Walls in the bedroom and living rooms were to be drilled and dust injected in the void areas. Baseboards, crack and crevices throughout the apartment were to be *518 injected with aerosol products to flush out the bedbugs. The exterminator was to check outlets, picture frames, dressers and all furniture.”[1]
The exterminator’s report indicates that bedbugs are tenacious and adapt very well to their environment and can go a whole year without feeding. They can migrate to other apartments quickly through the walls on the interior and exterior. Bedbugs can go from endemic to epidemic if not handled properly (see, respondent’s exhibit A). The exterminator had anticipated two extermination treatments, along with sealing of the cracks in each apartment, to control the bedbug outbreak in the building which affected nearly 9 of the 60 apartments in the building. The infestation seemed to be clustered in a specific area of the building. Each extermination was expected to last two to three months.
Petitioner chose to adopt the methodology in the report to combat the bedbugs as suggested by his exterminators (respondent’s exhibit A). However, the exterminators in attempting to eradicate the bedbug infestation in the premises ended up exterminating in the premises on five occasions in the year 2003 starting in June 2003.
In addition to the bedbugs, respondent also complained to petitioner concerning the condition of the shower stall and the kitchen unit shortly after he moved into the premises. For three weeks in January 2004, three of petitioner’s workers labored in the premises to correct the conditions. Petitioner’s workers removed the old shower stall unit and installed a bathtub (respondent’s exhibit E-3) which leaked after installation and caused damage to the studio room floor (respondent’s exhibit E-4). To date, there is a maze of piping from the kitchen area to the newly installed bathtub.
The court finds the condition of bedbugs in the building generally was known to petitioner early in June 2003 and with respect to the premises particularly in late June 2003 when respondent informed petitioner. An abatement based upon the implied warranty of habitability pursuant to Real Property Law § 235-b protects only against conditions that materially affect the health and safety of tenants or deficiencies that in the eyes of a reasonable person deprive the tenant of those essential functions which a residence is expected to provide. (Solow v *519 Wellner, 86 NY2d 582 [1995], quoting Park W. Mgt. Corp. v Mitchell, 47 NY2d 316 [1979].) Respondent showed through his graphic testimony that the bedbug infestation impacted or affected his health, safety and welfare and use of the premises. There can be no doubt that the presence of the bedbugs in the premises satisfies the above criteria for an abatement under these set of facts.
It is now for the court, in an apparent case of first impression involving warranty of habitability due to bedbugs, to determine the diminution in value of the premises. Although bedbugs are classified as vermin, they are unlike the more common situation of vermin such as mice and roaches, which, although offensive, do not have the effect on one’s life as bedbugs do, feeding upon one’s blood in hoards nightly turning what is supposed to be bed rest or sleep into a hellish experience. Therefore, the cases involving abatements for “vermin” (i.e., mice and roaches) are of limited precedential value for the court in fashioning an appropriate abatement.
The only reported cases involving bedbugs which the court was able to find come from the early 1900’s and predate warranty of habitability. These early cases revolve around whether the presence of the bedbugs constituted a constructive eviction. The cases turn on the severity of the infestation.[2]
The court is mindful that with time the prevalence of cases in which bedbugs are involved is sure to increase to an epidemic as the foothold the bedbugs have obtained in the urban setting of the City of New York grows ever larger. However, in fixing what is a proper abatement, the court is also mindful that the condition may not be attributable to a landlord, and that the landlord may attempt multiple exterminations to little or no avail due the resiliency of bedbugs from eradication.
In this case, the bedbugs did not constitute mere annoyance, but constituted an intolerable condition, notwithstanding the landlord’s efforts to exterminate them. Respondent however did *520 not vacate the premises or raise the defense of constructive eviction. In circumstances as in this case where a landlord has tried repeatedly to exterminate but the infestation is so overwhelming that although the tenant may have been relieved of his obligation to pay rent had he vacated, as he did not, equity requires the court take into account the purposes for which the premises was still being utilized by respondent. Stated differently, the court looks to what essential functions or uses respondent still used the premises notwithstanding the bedbugs.
Clearly one essential function of a residence is a place to sleep, but it is not the only function. Respondent continued to use the premises for shelter, eating, bathing and for work purposes which are other essential functions, or activities a premises is utilized. This in no way diminishes what respondent went through; however, whatever benefit was still being derived by respondent from the premises is fair to take into consideration in determining the abatement.
Based upon the small size of the premises, the severity of the bedbug infestation, the effect the infestation had on respondent, the lack of showing petitioner’s efforts to eradicate the bedbugs on a building-wide scale, petitioner’s diligent efforts to eradicate the bedbugs and the use respondent continued to make of the premises, the court finds an abatement of 45% commencing July 1, 2003 (date rent first sought in the petition) through December 31, 2003 to be appropriate (6 x $1,025 x 45% = $2,767.50). Respondent is granted an additional abatement in the sum of $150 for the other conditions complained of.
There was no testimony that any bedbugs were seen or present after December 2003. Presumably the multiple exterminations have finally turned the tide, and hopefully rendered the premises bedbug free. Although respondent continues to curtail his full use of the premises by sleeping on the metal cot rather than buy another bed for fear of reinfestation, there was no showing or testimony by a qualified expert that this is a potential risk due to a latency period before one can determine whether the eradication is successful, this precaution adopted by respondent on his own cannot serve for the court to grant a continuing abatement after December 31, 2003.
Accordingly, final judgment of possession in petitioner’s favor in the sum of $3,632.50 ($6,550 less abatements of $2,767.50 and $150) representing unpaid rents less abatement through April 30, 2003.

. The parties stipulated that the methodology to combat the bedbugs in respondent’s exhibit A was an effective method.

. Jacobs v Morand, 59 Misc 200 (App Term, 1st Dept 1908) (premises overrun by bedbugs making it inconvenient and untenable does not constitute a constructive eviction); Streep v Simpson, 80 Misc 666 (App Term, 2d Dept 1913) (where bedbugs constituted an insufferable nuisance, whose presence is nowise attributable to the tenant, causing substantial discomfort and severe inconvenience amounting to an intolerable state, the tenant was constructively evicted); Michtom v Miller, 178 NYS 395 (App Term, 1st Dept 1919) (presence of bedbugs constituted mere annoyance); Hancock Constr. Co. v Bassinger, 198 NYS 614 (App Term, 1st Dept 1923) (aggravated condition of bedbugs, so numerous they could not be exterminated, constituted constructive eviction).